**UNITED STATES FEDERAL COURT**
**DISTRICT OF MASSACHUSETTS**

_____

STEVEN A. FLORIO,                          )
                                           )
     Plaintiff                    )     C.A. NO.
                                           )
v.                                         )
                                           )
COMMONWEALTH OF MASSACHUSETTS,             )
GOVERNOR CHARLES E. BAKER, individually    )
and in his official capacity,              )
MARYLOU SUDDERS, individually and          )
in her capacity as Secretary of Health and )
Human Services,                            )
CATHERINE STARR, individually and in her   )
capacity as Secretariat Human Resources    )
Officer  and ERICA CRYSTAL, individually and in )
her capacity as Executive Office of Health and )
Human Services Labor Relations Director and )
Deputy General Counsel for the Commonwealth )
of Massachusetts,                          )
                                           )
     Defendants                   )
_____)

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

**INTRODUCTION**

1. The plaintiff, Steven Florio, the former Commissioner for the Massachusetts Commission
   for the Deaf and Hard-of-Hearing, brings this complaint seeking damages for violations
   of his federal and state civil and constitutional rights arising from the termination of his
   employment due to his membership in a college fraternity 29 years ago.

2. On or about June 5, 2020, false accusations were made against Mr. Florio in a
   Facebook post by a controversial deaf community blogger that plaintiff was depicted in a
   Gallaudet University 1990 yearbook group photo of the Kappa Gamma fraternity.   The
   fraternity members in the picture were allegedly engaged in the Bellamy Salute, the early
   1900s federally approved version of the then current salute of the American flag.

3. The Bellamy Salute, which the fraternity had used since 1901, involves a raised right arm and hand, which some believe resembles the salute used in Nazi Germany, despite the fact that it long predated that gesture.

4. The controversial blogger named the plaintiff on Facebook as being in the fraternity yearbook photo, even though he was not in the photograph, and asserted that the fraternity's salute was somehow affiliated with the Nazi salute.

5. These defamatory allegations were read online by the Deputy Legal Counsel for the Massachusetts Commission for the Deaf and Hard of Hearing and the Massachusetts Rehabilitation Commission, who is also deaf and a member of the deaf community.  The Deputy Counsel reported the false allegations to Legal Counsel, his boss, and, in turn, the false allegations were also reported to Secretariat Legal Counsel for the Executive Office of Health and Human Services.

6. These false allegations were thereafter provided to Defendant Governor Charles E. Baker.

7. Based on these false allegations, the defendants began investigating Mr. Florio in earnest, repeatedly grilling him as to whether he was in the photograph and whether he was a member of the Kappa Gamma fraternity.  Four separate investigations of the plaintiff were conducted.

8. While the Commonwealth was investigating the plaintiff, his superiors ordered him to read prepared statements produced by the defendants to his staff about his past membership in the fraternity.

9. These written statements were drafted, edited and approved by the plaintiff's superiors. The plaintiff was concerned about the tone and certain aspects of the mandated statements as they were cold, portrayed him in a false light and were not in his best interests.

10. Nevertheless, Plaintiff, coerced and pressured by the defendants, agreed to submit to their direction and as a result held several meetings between June 22 and June 30, addressing both direct and indirect reports within his office as Commissioner, wherein he read the defendants' statement verbatim.

11. The statements drafted by the defendants, and their required verbatim delivery to staff in Zoom meetings, became the primary reason for later complaints allegedly made against the Plaintiff.

12. The defendants required the Plaintiff to unequivocally disavow both his past and ongoing association with his college fraternity to his staff. The statement was demeaning and shameful in tone and reflected a misleadingly contrite admission by Mr. Florio for an innocent past association with the college fraternity. It stated in part: "I understand that due to my privilege, I could not see the damage done by the organization and its misguided traditions ... for that I am truly sorry ... I want to reiterate again that I disavow my association with that organization ..."

13. The Plaintiff's reading of Defendants' required statements during the Zoom meetings directly led to the local union's (Service Employees International Union, Local 509, AFL-CIO, CLC) June 29, 2020 defamatory and false letter to Governor Baker, which alleged that the plaintiff "admitted to dressing as a Nazi and saluting while wearing garb resembling the uniforms of the Ku Klux Klan during his time as a fraternity brother of Kappa Gamma at Gallaudet University."

14. These allegations were then published in a Boston Globe article on July 7, 2020. The plaintiff did not make the statements appearing in the Globe or the Union's letter. However, Governor Baker vowed to investigate the plaintiff.

15. As part of its investigation, the defendants encouraged and solicited staff to make complaints about the plaintiff. Four separate investigations were initiated regarding the plaintiff.

16. The plaintiff's eventual termination on October 19, 2020 was based on a series of manipulated, misleading, biased and fabricated internal complaints purportedly unrelated to his fraternity membership. The alleged complaints coming from Plaintiff's staff were made after the investigation started into the Plaintiff's association with his college fraternity. There were no complaints during Plaintiff's tenure as Commissioner up until this point in time.

17. Prior to the Commonwealth's investigation and solicitation of complaints, the plaintiff had never had a misconduct complaint against him by staff members in his Massachusetts office, nor in the 16 years of work as Executive Director for Rhode Island Commission on the Deaf and Hard of Hearing.

18. The plaintiff was essentially terminated from his employment with the Commonwealth because it was no longer politically correct to employ him, despite his unblemished public service record as the Commissioner in Massachusetts and his 16-year tenure as the Executive Director of the Rhode Island Commission on the Deaf and Hard of Hearing.

19. The plaintiff was provided no opportunity to effectively defend himself either during the Commonwealth's investigations or after his termination in October.  He has never been provided with the names of the complainants, the dates of their complaints or the specifics of any allegations made against him.

20. Despite his requests, Plaintiff was provided no pre-termination or post-termination process of any kind. Plaintiff specifically requested representation by legal counsel pre-termination and also requested a name-clearing hearing post-termination.

21. Plaintiff's termination by the Commonwealth has permanently and effectively banned him from working as an executive in the deaf and hard-of hearing community. Defendant's actions and public statements have caused and contributed to said ban on the Plaintiff from working in his chosen field of employment.

22. The plaintiff brings the following claims to clear his name and recover the devastating financial losses he has incurred and will incur: 1) common law wrongful termination; 2) violations of due process under federal and state law; 3) violations of freedom of association under federal and state law; and 4) violations of the Massachusetts Civil Rights Act.

**PARTIES**

23. The plaintiff is a resident of Norfolk County.

24. The defendant Commonwealth of Massachusetts is a state entity that employed the plaintiff.

25. The defendant Charles E. Baker is the Governor of Massachusetts who had the authority to hire and fire the plaintiff.

26. The defendant, Marylou Sudders is the Secretary of Health and Human Services for the Commonwealth of Massachusetts.  Her office is located at 1 Ashburton Place, Boston MA.  Defendant Sudders was the plaintiff's immediate supervisor.

27. The defendant Catherine Starr is a Secretariat Human Resources Officer for the Commonwealth of Massachusetts who was involved in the investigation of the plaintiff.

28. The defendant Erica Crystal is an Executive Office of Health and Human Services Labor Relations Director and Deputy General Counsel for the Commonwealth of Massachusetts.

29. Crystal and Starr are the Commonwealth of Massachusetts officials who carried out Defendant's coercive directions to Plaintiff to dissociate himself from his past association with the Kappa Gamma fraternity.

**JURISDICTION**

30. Jurisdiction is proper in this District all the defendants work for the Commonwealth in Boston, and the events at issue occurred here. Subject matter jurisdiction is also proper in this Court as the plaintiff alleges federal constitutional violations pursuant to 42 U.S.C.

§ 1983.  Accordingly, the court has jurisdiction of this case under and by virtue of Title 28 U.S.C. §§ 1331, 1341(3) and 1343.  The Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

## STATEMENT OF FACTS AND CLAIMS

31. In February of 2019, Steven A. Florio was appointed by Governor Charles E. Baker as the Commissioner of the Massachusetts Commission for the Deaf and Hard-of-Hearing ("MCDHH").  He served as Commissioner from February 19, 2019 until his termination on October 19, 2020. At all times, Plaintiff's service as Commissioner was exemplary and free from any semblance of criticism.

32. Prior to his termination, the Plaintiff had an excellent professional reputation.

33. Prior to becoming the Commissioner of MCDHH, the plaintiff had served successfully as the Executive Director of the Rhode Island Commission of the Deaf and Hard of Hearing ("RICDHH") for 16 years.

34. While Executive Director of RICDHH, the plaintiff received widespread praise for his work and had never had a complaint made against him for any reason.

35. When he left the RICDHH, the United States Department of Justice, District of Rhode Island presented Plaintiff with a special recognition award for his 16 years of service at RICDHH. On January 29, 2019, the Rhode Island House of Representatives and Senate voted unanimously in separate House and Senate Resolutions to honor his service to the State of Rhode Island, resolving in part: "WHEREAS, Highly-regarded among his peers, Steve Florio is a dedicated advocate for the deaf and hard of hearing population and a proven leader.  His efforts have had a positive and rewarding impact on the lives of many people, and he is enormously worthy of emulation and acknowledgement; . . ."

36.  The plaintiff is the co-founder of the National Association of the State Agencies of the Deaf and Hard of Hearing (NASADHH) and became its first president. Plaintiff continued as President for 6 years and then served 4 years as Treasurer.

37. While Executive Director of RICDHH, plaintiff also served as the Vice President of International Deaf Emergency ("IDE").  IDE is a non-profit organization in the United States being run by Deaf persons and is recognized as an International Member of the World Deaf Federation that has direct consultative status with the United Nations.  IDE's mission is to bridge the language, communication and relationship gaps between persons who are or with difficulty hearing and to offer emergency services such as pre-disaster preparedness and mitigation, rescue and relief in the context of disaster and post disaster rehabilitation, reconstruction and recovery.

38. In 2015, in the aftermath of a devastating earthquake in Haiti, plaintiff along with other IDE members led three missions to Haiti to teach and empower Deaf Haitians to advocate for themselves via a new local deaf organization and to guide them through the bylaw process, establish a new national deaf advocacy organization and to select officers of the new national organization.

39. Plaintiff created a video presentation of his and his fellow IDE members' advocacy work in Haiti which was presented at the World Federation of the Deaf in Istanbul, Turkey. The video is posted to the IDE's YouTube channel at https://www.youtube.com/watch?v=bJ-lVWBV1n0.

40. Through his deeds, plaintiff has enjoyed a national and international reputation for exemplary service to the Deaf and Hard of Hearing community with no complaints related to race, creed, gender or national origin. Plaintiff has received several accolades for his service to the deaf and hard of hearing communities.

41. Plaintiff is a 1992 graduate of Gallaudet University, a prestigious university for the deaf and hard of hearing.  He also has a Master's degree in leadership from Northeastern University.

42. Plaintiff is the recipient of the Gallaudet University Alumni Association's "Outstanding Young Alumnus Award" recognizing his contributions to the deaf and hard of hearing

community on a state level with the Pennsylvania Society for the Advancement of the Deaf and on a national level with the National Association for the Deaf.

43. For approximately one year while at Gallaudet -- April 1991 through the Spring of 1992 -- the plaintiff was a member of the Kappa Gamma fraternity.

44. Kappa Gamma was established in 1901 and has been known to be synonymous with Gallaudet. Gallaudet Presidents have been Kappa Gamma members.  In addition, numerous University board members have been Kappa Gamma members.  The father of the current Gallaudet president was a member of Kappa Gamma. The fraternity has historically served as a significant network for professionals and others who have worked on issues that affect the deaf and hard of hearing communities, nationally and internationally.

45. At or around the time of its founding, Kappa Gamma adopted the early 1900s national salute to the American flag, called the Bellamy Salute, for use in its formal fraternity functions.  The Bellamy Salute involves a raised right arm and hand in salute of the American flag.

46. At or around its founding, Kappa Gamma, like many fraternities, adopted the Greek life tradition of the use of robes in its ceremonies which were modeled on robes worn by monks.

47. At all times relevant hereto, Gallaudet University has been fully aware of Kappa Gamma's use of the Bellamy Salute and ceremonial robes. Numerous University past presidents and board members had been Kappa Gamma members. The strong public criticism of Kappa Gamma did not come about until mid-2020.

48. At all times during his eighteen months as the Commissioner of MCDHH, the plaintiff performed his duties in an exemplary manner, consistent with his prior 16 years of experience as Executive Director for RICDHH.

49. At no point in time until mid-2020 was the plaintiff the subject of a single complaint made against him by his staff for any reason.

50. On June 5, 2020, a false accusation was made against the plaintiff in a Facebook post by a controversial deaf community blogger that the plaintiff was depicted in a Gallaudet University 1990 yearbook group photo of the Kappa Gamma fraternity, who were allegedly engaged in the Bellamy Salute.

51. The controversial blogger named the plaintiff on Facebook as being in the fraternity yearbook photo, even though he was not in the photograph or a member of the fraternity in 1990.  Plaintiff was thereby associated with other Kappa Gamma members as having engaged in the Nazi salute, rather than the Bellamy Salute.

52. These defamatory allegations were read online by the Deputy Legal Counsel for the Massachusetts Commission for the Deaf and Hard of Hearing and the Massachusetts Rehabilitation Commission, who is also deaf and a member of the deaf community.  The Deputy Counsel reported the false allegations to Legal Counsel, his boss, and, in turn, the false allegations were also reported to Secretariat Legal Counsel for the Executive Office of Health and Human Services.

53. Based on these false allegations, the defendants began investigating the plaintiff in earnest, repeatedly grilling him as to whether he was in the photograph and whether he was a member of the Kappa Gamma fraternity. At that point, no allegations had been made against Plaintiff in regard to his conduct with staff members or in the workplace.

54. While the Commonwealth was investigating the Kappa Gamma issue regarding plaintiff, his superiors and other Commonwealth employees, particularly defendants Sudders, Starr and Crystal, required him to draft a statement for their review apologizing and disassociating himself from Kappa Gamma.

55. The defendants instructed plaintiff to read the statement verbatim in a series of Zoom meetings with staff, other Commonwealth employees and stakeholders.

56. The plaintiff was concerned about the tone and certain aspects of the mandated statements as they were cold, portrayed him in a false light and were not in his best interests.

57. Nevertheless, Plaintiff, coerced and pressured by the defendants and needing his job, agreed to submit to their direction and as a result held several meetings between June 22 and June 30, addressing both direct and indirect reports within his office as Commissioner, wherein he read the defendants' statement verbatim.

58. The required meetings, and the plaintiff's reading of defendants' required statements during the meetings, directly led to the local union's (Service Employees International Union, Local 509, AFL-CIO, CLC) June 29, 2020 defamatory and misleading letter to Defendant Governor Baker, which falsely stated that the plaintiff "admitted to dressing as a Nazi and saluting while wearing garb resembling the uniforms of the Ku Klux Klan during his time as a fraternity brother of Kappa Gamma at Gallaudet University."  As a further result, a vote of "no confidence" in the Commissioner was arranged by the Union.

59. The Union's letter to Governor Baker also referenced the June 22nd meetings and stated: "The Commissioner's blasé attitude and dismissive response left much to be desired."  In the June 22nd meetings, the plaintiff had read the verbatim statement written by the defendants.

60. Defendants never informed the Union or its members that they had written the statement that the defendant was required to read on June 22 and to send out in written form and had not allowed him to deviate from the script they had written.

61. On July 7, 2020, the Boston Globe published an article quoting from the Union's June 29, 2020 letter to Governor Baker further defaming the plaintiff and damaging his reputation.

62. The plaintiff did not make the statements appearing in the Globe or the Union's letter. However, Governor Baker vowed to investigate the plaintiff nonetheless.

63. As part of its investigation, the defendants encouraged and solicited staff to make complaints about the plaintiff.  A second investigation was opened by human resources, now focusing on Plaintiff's work performance and not Kappa Gamma.

64. The defendants pressured plaintiff to remove a reference to Kappa Gamma on his dormant LinkedIn account.

65. On July 9, 2020, without any stated cause, plaintiff was placed on administrative leave. However, he was required to cooperate and communicate with investigators despite not being allowed any form of due process.

66. The first investigation, run by Chantal St. Fleur, Deputy Director of EHS Office of Diversity and Civil Rights, focused on Kappa Gamma and the plaintiff's June 22 apology and disavowal meetings. The plaintiff was allowed to have his lawyer in the remote meetings with Ms. St. Fleur but his counsel was not allowed to speak, participate, ask questions or obtain documents or information regarding the allegations being investigated.

67. The second investigation was conducted by an investigator from the Center of Expertise of the Human Resources Division and focused on a series of previously undisclosed allegations made against the plaintiff.  The plaintiff was denied legal counsel in the second investigation.

68. The plaintiff met with the defendants at least 15 separate times as part of their investigations (June 5, June 9, June 12, June 13, June 14, June 15, June 19, June 24, July 7, July 9, July 13, July 17, July 22, July 28, September 3).

69. The plaintiff's eventual termination issued by defendant Sudders was the result of the series of manipulated, misleading, biased and fabricated internal complaints allegedly unrelated to his fraternity membership.  All of the alleged complaints were made after the investigation started into his association with his college fraternity and the false allegation that he had been in the photograph posted on Facebook.

70. The defendants' investigation and reasons for termination of the plaintiff were pre-textual attempts to remove the plaintiff as Commissioner due to his membership in a fraternity over 29 years ago in order to provide political cover to the Defendants Baker and Sudders.

71. Months after he was terminated, the plaintiff learned of two additional investigations against him, both of which found the claims against him to be unsubstantiated.

72. All total, the defendants conducted four separate investigations into the plaintiff after he was falsely accused of being depicted in an online picture of Kappa Gamma.

73. Prior to the Commonwealth's investigation and solicitation of complaints, the plaintiff had never had a single staff complaint against him in the 17 plus years of combined work as the Commissioner and as Executive Director in Rhode Island.

74. The plaintiff was denied the opportunity to defend himself during the State's extensive investigations of him, and after his termination as well.  He has never been provided with the names of alleged complainants, the dates of their complaints or the specifics of any allegations made against him.

75. Plaintiff was provided no pre-termination or post-termination process of any kind, despite repeatedly requesting to be represented by counsel pre-termination and for a name-clearing hearing post-termination.

76. Plaintiff's termination by the Commonwealth has permanently and effectively banned him from working as an executive in the deaf and hard-of hearing community.  He has sought executive level jobs and has not been able to even obtain an interview. His career has been cancelled.

## Count 1
### Wrongful Termination as Against Public Policy
### (Defendants Commonwealth of Massachusetts, Sudders and Baker)

77.  At all times relevant hereto, the plaintiff was employed by the defendants as the Commissioner of MCDHH.

78. Prior to the false allegations made about him in a Facebook post being reported to his superiors by a work colleague, his performance as Commissioner had been exemplary and never in question.  His long-term devotion to the Deaf and Hard of Hearing community was well documented.

79. Once the defendants learned of the Plaintiff's membership in Kappa Gamma while in college 29 years ago, rather than allow Plaintiff to defend himself or order an independent law firm to investigate as other states had done for Kappa Gamma members and the Commonwealth has done for other executive level employees, Defendants, though its words, actions and deeds, sought to create and frame an explanation and reaction from Plaintiff to force the Plaintiff to disavow and denounce any past, current or future association with Kappa Gamma.

80. These acts and deeds included, but are not limited to the following: a) repeatedly questioning him about his association with Kappa Gamma, his contributions to Kappa Gamma and any continued involvement with Kappa Gamma; b) requiring him to produce photographs and documentation regarding his association with Kappa Gamma while at Gallaudet; c) requiring him to draft a statement disavowing any past, current or future association with Kappa Gamma which the defendant then edited; d) drafting written statements for the plaintiff to read to staff and Commonwealth employees which repudiated his association with Kappa Gamma; e) requiring the plaintiff to remove any reference to Kappa Gamma on his Linked-In profiles; f) actively soliciting staff complaints about the plaintiff in an effort to  create a pre-textual reason for terminating the plaintiff for a reason other than his association with Kappa Gamma; g) denying the plaintiff legal representation or due process to challenge its attack on his freedom of association; h) conducting a biased, manipulated, incomplete and investigatory process with the goal of creating a pre-textual reason for terminating the plaintiff; i) suspending

the plaintiff due his association with Kappa Gamma and j) terminating the plaintiff for his association with Kappa Gamma.

81. The plaintiff had a constitutionally protected right to associate with Kappa Gamma, which right arises from activities protected by the Massachusetts bill of rights and the right to associate for the purpose of speech and assembly.

82. The plaintiff also had a constitutionally protected right to due process under Massachusetts law where the defendants' acts and deeds are reasonably calculated to result in tremendous and permanent damage to the plaintiff's personal and professional reputation thereby rendering him unemployable in his profession.

83. Suspending and then terminating the plaintiff in violation of these rights constitutes wrongful termination in violation of public policy.

84. The defendants violated the plaintiff's right to freedom of association and due process by engaging in the above-described acts.  As a direct and proximate result of the defendants' violation of the plaintiff's constitutional rights, he has suffered damages including the loss of his job, a ruined reputation, lost past and future wages and benefits and the infliction of tremendous emotional distress.

<u>**Count 2**</u>
**Violation of Massachusetts Constitution and Declaration of Rights -- Freedom of Association**
**(as to all defendants)**

85. The plaintiff incorporates the preceding paragraphs by reference.

86. At all times relevant hereto, the plaintiff was employed by the defendants as the Commissioner of MCDHH.

87. Prior to the false allegations made about him in a Facebook post being reported to his superiors by a colleague, Plaintiff's performance as Commissioner had been exemplary and not in question.  His long-term devotion to the Deaf and Hard of Hearing community was well documented.

88. Once the defendants learned of the plaintiff's membership in Kappa Gamma while in college 29 years ago, rather allow Plaintiff to defend himself or reasonably investigate Plaintiff as other states had done for Kappa Gamma members and the Commonwealth had done for other executive level employees, it sought through its words, actions and deeds to force the plaintiff to disavow and denounce any past, current or future association with Kappa Gamma.

89. These acts and deeds included the following: a) repeatedly questioning him about his association with Kappa Gamma, annual membership dues, his donations to Kappa Gamma via Gallaudet, a speech he gave in 2018 as a guest speaker at a Kappa Gamma banquet and any continued involvement with Kappa Gamma; b) requiring him to produce photographs and documentation regarding his association with Kappa Gamma while at Gallaudet; c) requiring him to draft a statement disavowing any past, current or future association with Kappa Gamma which the defendant then edited; d) drafting written statements for the plaintiff to read to staff and Commonwealth employees which repudiated his association with Kappa Gamma; e) requiring the plaintiff to remove any reference to Kappa Gamma on his Linked-In profiles; f) actively soliciting staff complaints about the plaintiff in an effort to  create a pre-textual reason for terminating the plaintiff for a reason other than his association with Kappa Gamma; g) denying the plaintiff legal representation or due process to challenge its attack on his freedom of association; h) conducting a biased, manipulated, incomplete and investigatory process with the goal of creating a pre-textual reason for terminating the plaintiff; i) suspending the plaintiff due his association with Kappa Gamma and j) terminating the plaintiff for his association with Kappa Gamma.

90. The plaintiff had a constitutionally protected right to associate with Kappa Gamma, which right arises from activities protected by the Massachusetts Declaration of Rights such as

the right to associate for the purpose of speech and assembly, and also has a

constitutionally protected right to employment under the circumstances.

91. The plaintiff also had a constitutionally protected right to due process where the

defendants' acts and deeds were reasonably calculated to result in irreparable and

permanent damage to the plaintiff's personal and professional reputation thereby

rendering him unemployable in his profession.

92. Suspending and then terminating the plaintiff in violation of these rights constitutes a

violation of the plaintiff's right to freedom of association.

93. The defendants violated the plaintiff's right to freedom of association and due process by

engaging in the above-described acts.  As a direct and proximate result of the

defendants' violation of the plaintiff's constitutional rights, he has suffered damages

including the loss of his job, a ruined reputation, lost past and future wages and benefits

and the infliction of tremendous emotional distress.

## Count 3
### Violation of Massachusetts Constitution and Declaration of Rights – Due Process
### (as to all defendants)

94. The plaintiff incorporates the preceding paragraphs by reference.

95. At all times relevant hereto, the plaintiff was employed by the defendants as the

Commissioner of MCDHH.

96. The plaintiff, as an executive level state employee, had a protected property interest in

employment. The plaintiff also had a constitutionally protected right to due process

where the defendants' acts and deeds were reasonably calculated to result in irreparable

and permanent damage to the plaintiff's personal and professional reputation thereby

rendering him unemployable in his profession.

97. The plaintiff repeatedly requested a right to legal counsel during the investigatory

process, participation of his counsel and for information pertaining to the secret

allegations being made against him. Post termination, Plaintiff made a written demand for a name-clearing hearing, which Defendants have denied.

98. All of the plaintiff's requests for due process were rejected by the defendants.  These requests were denied despite the fact the defendants staff attorneys repeatedly questioned the plaintiff outside the presence of his counsel.

99. The defendants violated the plaintiff's rights to due process by a) denying him legal counsel; b) failing to disclose the allegations against him; c) failing to conduct a hearing pre-termination and d) failing to conduct a post-termination name-clearing hearing.

100.      The plaintiff was suspended and then terminated without being afforded these rights.   At the time of his termination, and after, the defendants released public statements which implied that the plaintiff had committed racist, anti-Semitic and/or discriminatory acts while employed by the defendants further compounding the effects of their lack of due process.

101.      The plaintiff's good name and reputation have been severely damaged as he has been unable to find another executive position in the Deaf and Hard of Hearing community as he has essentially been ostracized due to his termination and the circumstances surrounding his termination.

102.      As a direct and proximate result of the defendants' violation of the plaintiff's due process rights, he has suffered damages including the loss of his job, a ruined reputation, lost past and future wages and benefits and the infliction of tremendous emotional distress.

### Count 4
### Violations of the Massachusetts Civil Rights Act
### (Defendants Sudders, Starr and Crystal individually and in their official capacity with respect to injunctive relief)

103.      The plaintiff incorporates the preceding paragraphs by reference.

104.     The plaintiff had a right to be free from threats, intimidation and coercion, as defined by the Massachusetts Civil Rights Act ("MCRA"), in the exercise or enjoyment of his constitutional, statutory or other legal rights.

105.     The defendants Sudders, Starr and Crystal engaged in acts and deeds which constituted violations of the MCRA, including but not limited to the following:  a) repeatedly questioning the plaintiff about his association with Kappa Gamma, annual membership dues, his donations to Kappa Gamma via Gallaudet, a speech he gave in 2018 as a guest speaker at a Kappa Gamma banquet and any continued involvement with Kappa Gamma; b) requiring him to produce photographs and documentation regarding his association with Kappa Gamma while at Gallaudet; c) requiring him to draft a statement disavowing any past, current or future association with Kappa Gamma which the defendant then edited; d) requiring the plaintiff to read or otherwise disseminate his disavowal of Kappa Gamma; e) drafting written statements for the plaintiff to read to staff and Commonwealth employees which repudiated his association with Kappa Gamma; g) requiring the plaintiff to remove any reference to Kappa Gamma on his Linked-In profiles; h) actively soliciting staff complaints about the plaintiff in an effort to  create a pre-textual reason for terminating the plaintiff for a reason other than his association with Kappa Gamma; i) denying the plaintiff legal representation or due process to challenge its attack on his freedom of association; j) conducting a biased, manipulated and incomplete investigatory process with the goal of creating a pre-textual reason for terminating the plaintiff; k) suspending the plaintiff due to his association with Kappa Gamma and l) terminating the plaintiff for his association with Kappa Gamma.

106.     The above-described acts, singularity and in combination, constituted threats, intimidation and/or coercion prohibited by the MCRA, which in turn resulted in Plaintiff losing his position as Commissioner as threatened by Defendants when coercing or ordering Plaintiff to address his staff with an apology and disavowal.

107.     As a direct and proximate result of the defendants' violation of the plaintiff's due

process rights, he has suffered damages including the loss of his job, a ruined

reputation, lost past and future wages and benefits and the infliction of tremendous

emotional distress.  He has also been denied a name clearing hearing.

**Count 5**
**Violations of Federal Right to Freedom of Association Pursuant to 42 U.S.C.**
**§1983**
**(as to Baker, Sudders, Starr and Crystal individually and in their official capacity**
**with respect to injunctive relief)**

108.     The plaintiff incorporates the preceding paragraphs by reference.

109.     At all times relevant hereto, the plaintiff was employed by the defendants as the

Commissioner of MCDHH.

110.     Prior to the false allegations made about him in a Facebook post being reported

to his superiors by a colleague, Plaintiff's performance as Commissioner had been

exemplary and not in question.  His long-term devotion to the Deaf and Hard of Hearing

community was well documented.

111.     Once the defendants learned of the plaintiff's membership in Kappa Gamma

while in college 29 years ago, rather allow Plaintiff to defend himself or reasonably

investigate Plaintiff as other states had done for Kappa Gamma members and the

Commonwealth had done for other executive level employees, it sought through its

words, actions and deeds to force the plaintiff to disavow and denounce any past,

current or future association with Kappa Gamma.

112.     These acts and deeds included the following: a) repeatedly questioning him

about his association with Kappa Gamma, annual membership dues, his donations to

Kappa Gamma via Gallaudet, a speech he gave in 2018 as a guest speaker at a Kappa

Gamma banquet and any continued involvement with Kappa Gamma; b) requiring him to

produce photographs and documentation regarding his association with Kappa Gamma

while at Gallaudet; c) requiring him to draft a statement disavowing any past, current or

future association with Kappa Gamma which the defendant then edited; d) drafting written statements for the plaintiff to read to staff and Commonwealth employees which repudiated his association with Kappa Gamma; e) requiring the plaintiff to remove any reference to Kappa Gamma on his Linked-In profiles; f) actively soliciting staff complaints about the plaintiff in an effort to  create a pre-textual reason for terminating the plaintiff for a reason other than his association with Kappa Gamma; g) denying the plaintiff legal representation or due process to challenge its attack on his freedom of association; h) conducting a biased, manipulated, incomplete and investigatory process with the goal of creating a pre-textual reason for terminating the plaintiff; i) suspending the plaintiff due his association with Kappa Gamma and j) terminating the plaintiff for his association with Kappa Gamma.

113.      The plaintiff had a constitutionally protected right to associate with Kappa Gamma, which right arises from activities protected by the First Amendment to the federal Constitution and Massachusetts Declaration of Rights such as the right to associate for the purpose of speech and assembly, and also has a constitutionally protected right to employment under the circumstances.

114.      The plaintiff also had a federally constitutionally protected right to due process where the defendants' acts and deeds were reasonably calculated to result in irreparable and permanent damage to the plaintiff's personal and professional reputation thereby rendering him unemployable in his profession.

115.      Suspending and then terminating the plaintiff in violation of these rights constitutes a violation of the plaintiff's right to freedom of association.

116.      The defendants violated the plaintiff's right to freedom of association and due process by engaging in the above-described acts.  As a direct and proximate result of the defendants' violation of the plaintiff's constitutional rights, he has suffered damages

including the loss of his job, a ruined reputation, lost past and future wages and benefits
and the infliction of tremendous emotional distress.

**Count 6**
**Violations of Federal Right to Due Process Pursuant to 42 U.S.C. §1983**
**(as to Baker, Sudders, Starr and Crystal individually and in their official capacity**
**with respect to injunctive relief)**

117.    The plaintiff incorporates the preceding paragraphs by reference.

118.    At all times relevant hereto, the plaintiff was employed by the defendants as the
Commissioner of MCDHH.

119.    The plaintiff, as an executive level state employee, had a protected property
interest in employment. The plaintiff also had a constitutionally protected right to due
process where the defendants' acts and deeds were reasonably calculated to result in
irreparable and permanent damage to the plaintiff's personal and professional reputation
thereby rendering him unemployable in his profession.

120.    The plaintiff repeatedly requested a right to legal counsel during the investigatory
process, participation of his counsel and for information pertaining to the secret
allegations being made against him. Post termination, Plaintiff made a written demand
for a name-clearing hearing, which Defendants have denied.

121.    All of the plaintiff's requests for due process were rejected by the defendants.
These requests were denied despite the fact the defendants staff attorneys repeatedly
questioned the plaintiff outside the presence of his counsel.

122.    The defendants violated the plaintiff's rights to due process by a) denying him
legal counsel; b) failing to disclose the allegations against him; c) failing to conduct a
hearing pre-termination and d) failing to conduct a post-termination name-clearing
hearing.

123.    The plaintiff was suspended and then terminated without being afforded these
rights.   At the time of his termination, and after, the defendants released public

statements which implied that the plaintiff had committed racist, anti-Semitic and/or discriminatory acts while employed by the defendants further compounding the effects of their lack of due process.

124.     The plaintiff's good name and reputation have been severely damaged as he has been unable to find another executive position in the Deaf and Hard of Hearing community as he has essentially been ostracized due to his termination and the circumstances surrounding his termination. He has applied for unemployment compensation ~~and~~ which has not been approved.

125.     As a direct and proximate result of the defendants' violation of the plaintiff's due process rights, he has suffered damages including the loss of his job, a ruined reputation, lost past and future wages and benefits and the infliction of tremendous emotional distress.

<u>**Count 7**</u>
**Tortious Interference with Advantageous Relations**
**(as to Sudders, Starr and Crystal individually)**

126.     The plaintiff incorporates the preceding paragraphs by reference.

127.     At all times relevant hereto, the plaintiff was employed by the Commonwealth of Massachusetts as the Commissioner of MCDHH for which he was paid an annual salary and provided other benefits.  The defendants were aware of the plaintiff's employment with the Commonwealth.

128.     The defendants through the following acts, deeds and omissions knowing induced the Commonwealth to terminate the plaintiff's employment by a) repeatedly questioning him about his association with Kappa Gamma, annual membership dues, his donations to Kappa Gamma via Gallaudet, a speech he gave in 2018 as a guest speaker at a Kappa Gamma banquet and any continued involvement with Kappa Gamma; b) requiring him to produce photographs and documentation regarding his association with Kappa Gamma while at Gallaudet; c) requiring him to draft a statement

disavowing any past, current or future association with Kappa Gamma which the
defendant then edited; d) drafting written statements for the plaintiff to read to staff and
Commonwealth employees which repudiated his association with Kappa Gamma; e)
requiring the plaintiff to remove any reference to Kappa Gamma on his Linked-In
profiles; f) actively soliciting staff complaints about the plaintiff, which resulted on four
separate investigations of the plaintiff, in an effort to  create a pre-textual reason for
terminating the plaintiff for a reason other than his association with Kappa Gamma; g)
denying the plaintiff legal representation or due process to challenge its attack on his
freedom of association; h) conducting a biased, manipulated, incomplete and
investigatory process with the goal of creating a pre-textual reason for terminating the
plaintiff; i) suspending the plaintiff due his association with Kappa Gamma and j)
recommending and/or participating in the termination of the plaintiff's employment.

129.     The defendant's interference with the plaintiff's employment was improper in
motive and means as it was designed to create a pre-text for his termination for his
involvement in a college fraternity 29 years ago, violated his civil rights and was
designed to turn his co-workers and the Union against him.

130.     As a direct and proximate result of the defendants' violation of the plaintiff's
rights, he has suffered damages including the loss of his job, a ruined reputation, lost
past and future wages and benefits and the infliction of tremendous emotional distress.

<u>**Request for Relief**</u>

WHEREFORE, the plaintiff requests the following compensatory and injunctive
relief:

a)  a name clearing hearing on his due process and civil rights claims;

b)  compensatory damages, including but not limited to past and future wages
    and benefits;

c)  emotional distress damages;

d) punitive damages as allowed by law;

e) attorney's fees and costs as provided by the MCRA and section 1983 and

f) pre-and post-judgment interest to the extent allowed by law.

## THE PLAINTIFF CLAIMS A TRIAL BY JURY

On behalf of the Plaintiff,

/s/ Philip N. Beauregard

_____

Philip N. Beauregard
BBO# 034780
BEAUREGARD, BURKE & FRANCO
32 William Street
New Bedford, MA 02740
508-993-0333
pbeauregard@bbflawoffices.com

/s/ Carlin J. Phillips

_____

Carlin J. Phillips
BBO# 561916
PHILLIPS & GARCIA, P.C.
13 Ventura Drive
Dartmouth, MA 02747
508-998-0800
508-998-0919 (fax)
cphillips@phillipsgarcia.com