

THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE FOR ADMINISTRATION AND FINANCE
## HUMAN RESOURCES DIVISION
100 CAMBRIDGE STREET, SUITE 600, BOSTON, MA  02114

CHARLES D. BAKER
Governor

KARYN E. POLITO
Lieutenant Governor

MICHAEL J. HEFFERNAN
Secretary

JEFF McCUE
Assistant Secretary
Chief Human Resources Officer

# HRD Investigations Center of Expertise Report

<u>Background</u>

*Name of Investigator(s):*
*Lead Investigator:* Justine Plaut
*Date of Report:* September 28, 2020
*Case Number:* COM0001261[1]
*Complainants:* Anonymous
*Respondent:* Commissioner Steven Florio
*Agency:* Massachusetts Commission for the Deaf and Hard of Hearing ("MCDHH")
*Allegations:* Violation of the Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees; Violation of Executive Order No. 526
*Date of Allegations:* Ongoing through June 2020
*Date of Complaint:* July 8, 2020
*Dates of Investigation:* July 8, 2020 – September 10, 2020

<u>Synopsis</u>

On July 8, 2020, an anonymous complaint was made to the Investigations Center of Expertise ("COE"), alleging Commissioner Steven Florio, hereinafter referred to as "Respondent," engaged in Sexual Harassment in violation of the Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees. As the investigation progressed, additional allegations of policy violations were raised. Complainants alleged Respondent engaged in discrimination in violation of Executive Order No. 526 on the basis of religion, race, gender, and disability.

The investigation revealed the Respondent's conduct violated Commonwealth policy as to Executive Order No. 526 in part, and did not violate Commonwealth policy as to the Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees. Thus, this investigation substantiates that Respondent Steven Florio engaged in discrimination based on race, gender, and disability in violation of Executive Order No. 526. This investigation does not substantiate that Respondent Steven Florio engaged in discrimination based on religion in violation of Executive Order No. 526, and does not substantiate that Respondent Steven Florio engaged in Sexual Harassment in violation of the Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees.

---

[1] Several additional COE Complaints were consolidated into this report: COM0001268, COM0001276, COM0001278, COM0001292, COM0001291, and COM0001294.

This report constitutes the results of the investigation and includes the following:

   I.     Scope and Purpose of Investigation
   II.    Background
   III.   Summary of Interviews
   IV.    Findings of Fact
   V.     Conclusion

## I.    Scope and Purpose of Investigation

The scope and purpose of this investigation was to determine whether the alleged conduct occurred and if so, whether Commissioner Steven Florio:

1) Engaged in Sexual Harassment in violation of the Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees;

2) Engaged in Discrimination based on Religion in violation of Executive Order No. 526;

3) Engaged in Discrimination based on Race in violation of Executive Order No. 526;

4) Engaged in Discrimination based on Gender in violation of Executive Order No. 526; and/or

5) Engaged in Discrimination based on Disability in violation of Executive Order No. 526.

## II.    Background

Documents

The following documents were received and reviewed by the Investigator:

- Sexual Harassment Policy for Commonwealth of Massachusetts Executive Department Employees
- Executive Order No. 526
- Materials provided by Respondent:[2]
  - *Emails*
    - Commissioner's Weekly Message email dated February 7, 2020
    - Commissioner's Weekly Message email dated February 14, 2020
    - Commissioner's Weekly Message email dated February 21, 2020
    - Commissioner's Weekly Message email dated February 28, 2020
    - Commissioner's Weekly Message email dated March 6, 2020
      - Email from Jane Sokol Shulman thanking Respondent for the Weekly Message dated March 6, 2020
    - Commissioner's Weekly Message email dated June 26, 2020
    - Commissioner's Weekly Message email dated July 2, 2020

---

[2] Several days after the investigative interview, on September 9, 2020, the Respondent sent a series of twelve emails to the undersigned. These emails contained various attachments and links. While not all the provided documents were relevant to the investigation, the undersigned reviewed all the material provided.

- Correspondence and meeting agendas regarding the dress code policy
- Correspondence regarding the Protest Interpreter Group
- Correspondence regarding the use of staff interpreters vs. freelance interpreters
- Correspondence regarding the Interpreter Screening Program
- Correspondence regarding DEAFintiely
- Correspondence regarding SEIU 509 Union
- Correspondence regarding the National Deaf People of Color (NDPC) Conference
- MCDHH Statement of Support dated June 5, 2020
- Email from Respondent to his assistant, Hana Hanigan, re: scheduling a meeting with James Wiggins dated
- Email thread between Respondent and Aurora Wilber re: Stephanie Hakulin – CDI TV Press Conference
- Email from Jonathan O'Dell to Respondent regarding the May 20, 2020 Deafblind video meeting

o *Web links:*
  - https://www.verywellhealth.com/deaf-culture-audism-1046267#:~:text=Audism%20is%20a%20term%20used,accommodate%20those%20who%20cannot%20hear.
  - https://blog.ai-media.tv/blog/what-is-audism
  - https://en.wikipedia.org/wiki/Audism
  - http://deafchoice.com/faq/what-is-an-audist/
  - https://pdfs.semanticscholar.org/dd4d/488ccac0b6e3e9f7298e6d092a800050c48d.pdf
  - https://infoguides.rit.edu/deafgainaudism
  - https://www.handspeak.com/culture/index.php?id=99
  - https://www.lexico.com/en/definition/phonocentrism

o *Mission Statements for various institutions for the Deaf and Hard of Hearing:*
  - Gallaudet University Mission and Vision Statement
  - The Learning Center for the Deaf Mission and Vision Statement
  - The Horace Mann School for the Deaf and Hard of Hearing Mission Statement
  - The Children's Communication Center Mission Statement
  - DEAF, Inc., Communication Access Statement

o *Miscellaneous:*
  - Flyer for November 21, 2019 Cornel West event hosted by the Massachusetts College for Art and Design
  - December 20, 2019 Outlook Meeting Invitation, "POC Issues and Opportunities"
  - Agenda for the January 15, 2020 Executive Team meeting
  - Western Massachusetts Association for the Deaf Spring 2020 Newsletter
  - Agenda for the June 2, 2020 Executive Team meeting
  - June 3, 2020 Outlook Meeting Invitation, "Deafblind video"
  - Guideline for Usage of Staff Interpreter Services summary dated July 6, 2020

Investigation Background

On June 22, 2020, Respondent, Commissioner Steven Florio, held a series of meetings over Zoom with MCDHH employees to address the allegations of his involvement with the Kappa Gamma fraternity at Gallaudet University, including allegations of wearing Ku Klux Klan and/or Nazi inspired robes.[3] The meetings, held over the course of the day, were organized between Respondent and small groups of MCDHH employees, typically broken down by department (referral services, interpreter services, etc.) During and after the calls, several MCDHH employees expressed concern with the content of the calls and the underlying allegations: consequently, EOHHS conducted an investigation into these complaints.[4]

Local SEIU 509 held a meeting for its MCDHH employee-members after the June 22 meetings, as a "safe space" for members to share their feelings following the allegations and Respondent's response to the allegations.[5] In the meeting, several members reported their own allegations against Respondent, including allegations of sexual harassment. Carolyn Hjelte, Local 509 Chapter President, and Kathryn Luckett, MCDHH employee and union steward, facilitated the meeting, which Luckett characterizes as "quite traumatizing." In the meeting, Luckett states the members discussed "racial issues and [how Respondent] is demeaning towards women. It was heartbreaking, people had been suffering alone." Hjelte reports she "knew it was going to be bad, but it was like a dam broke. It was sad, [and the members present] were very affected." The members granted Hjelte and Luckett permission to share their concerns with the COE, on an anonymous, high-level basis. After a July 9, 2020 phone call with Hjelte and Luckett, the undersigned began this investigation.

As the investigation progressed, additional claims of discrimination based on religion, race, gender, and disability, were alleged, and subsequently investigated by the undersigned. The scope of this investigation accordingly grew from the initial allegations of Sexual Harassment to the current scope.

Interviewed employees raised numerous additional allegations that, in and of themselves, would not rise to the level of a policy violation. Consequently, a number of complaints that did not provide additional evidence of any of the five alleged policy violations were not addressed in this report.

Finally, interpreter ethics and confidentiality influenced the investigative interviews and the availability of interviewing interpreters who work with Respondent regarding the content of the interpreting. Luckett explains there is a "very strong" code of ethics preventing interpreters from disclosing information they learn through interpreting. Unless interpreters deem conduct to be "illegal" or "breaking policy," they are barred from sharing the conduct if they would not have knowledge of the conduct but for their interpreting assignment. Consequently, the interpreters interviewed for this investigation were only able to share conduct they witnessed in their capacity as participants in a meeting or employees in the office, and not during

---

[3] https://boston.cbslocal.com/2020/07/08/steven-florio-commission-for-the-deaf-kkk-robe-photo-gallaudet-university/

[4] The EOHHS investigation is separate from this COE investigation. While some Complainants in this investigation made allegations to the undersigned regarding the June 22, 2020 phone call and the Commissioner's alleged involvement with the Kappa Gamma fraternity, these allegations fell outside the scope of this investigation and were not considered.

[5] According to Chapter President Carolyn Hjelte. Hjelte was not interviewed for this investigation but provided background information regarding the union meetings.

conversations they interpreted.

III.  **Summary of Interviews**

During the investigation, the Investigations COE interviewed the following MCDHH employees along with the Respondent, Commissioner Steven Florio:

1.  Johnathan O'Dell, Communication Accessibility Training Specialist
2.  David Del Pizzo, Referral Supervisor
3.  Shannon Silvestri, Interim Program Director for Victim Services
4.  Jane Sokol-Shulman, Procurement and Contracting Manager
5.  Lori Novak, Clerk
6.  Tony Harrison, Referral Specialist
7.  Sharon MacLean, Case Manager
8.  Christine West, Commissioner's Staff Interpreter
9.  Hana Hanigan, Executive Assistant to the Commissioner
10. Allison Fondo, Adult Case Manager
11. Jesse "Rupert" Dubler, Staff Interpreter
12. Marlene Hostovsky, Accountant
13. Janay Mitchell, Business Office Coordinator
14. Edgar Herrera, Business Manager
15. Cheryl Keeter, Freelance Interpreter
16. Sehin Mekuria, Deputy Commissioner for Administration and Finance; Chief Financial Officer
17. Terry Malcolm, Deaf Interpreter
18. Denise Martinez, Interpreter Supervisor
19. Kathryn Luckett, Interpreter/CART Referral Specialist
20. Aurora Wilber, Project Coordinator
21. Sharon Harrison, Case Manager
22. Carol Menton, HSC II
23. Kristin Johnson, Director of Case Management
24. Karin Eddy, Human Resources Liaison
25. Tricia Ford, Deputy Commissioner for Programming and Policy and Acting Commissioner

Due to the COVID-19 pandemic and related social distancing mandates, the interviews were conducted via Zoom, save for Kristin Johnson who requested the interview be conducted via Video Relay Service.[6] The interviews were audiotaped to have an accurate and contemporaneous record of the interviews.

American Sign Language, or "ASL," interpreters were used during several interviews at the request of the parties. Respondent Steven Florio's interview was interpreted by certified legal interpreters Joan Wattman and Cat Dvar. To ensure the interpreters were accurately translating Respondent's intended words and phrasing, the undersigned repeated material statements back to Respondent via the interpreters throughout the interview, to confirm with the Respondent that the correct interpretation was being relayed.

---

[6] Per the Federal Communications Commission (FCC): "Video Relay Service is a form of Telecommunications Relay Service that enables persons with hearing disabilities who use American Sign Language to communicate with voice telephone users through video equipment, rather than through typed text."

1) <u>Allegations of Sexual Harassment</u>

**a) Generally**

During this investigation, the majority of interviewed employees denied directly witnessing Respondent engage in Sexual Harassment. Kathryn Luckett states she has had "conversations" regarding alleged Sexual Harassment by Respondent with "five or six females" in her capacity as a union steward, but reports she has "not directly witnessed" Respondent engage in such conduct.[7] Jesse "Rupert" Dubler reports he has not witnessed Respondent engage in "explicit" Sexual Harassment, but reports there have been some "implications" from Respondent at a 2019 Christmas party where there was "subtext" towards his wife.

**b) Inappropriate comment about an interpreter's lips**

<u>Allegations</u>

Several MCDHH employees allege witnessing Respondent engage in Sexual Harassment on a Zoom in the Spring of 2020, during the COVID-19 Pandemic. Respondent allegedly made an inappropriate comment about an interpreter's lips during a discussion about obtaining clear face masks for interpreter use in the community. Specifically, Aurora Wilber stated Respondent told an interpreter "they were looking at your lips" after the interpreter expressed receiving positive feedback from the community about clear face masks. Wilber recalls the interpreter saying the "face masks with a clear partition are helpful to client to see [her] face and mouth." Aurora reports Respondent replied, "in [an] odd affect, 'They were looking at your *lips*.'" Wilber characterizes the comment as "sexualized," and states Respondent "emphasized [the word lips] in signing."

Shannon Harrison reports Respondent replied to an interpreter's assessment of the success of clear masks with, "No, they just want to see your lips." Harrison states Respondent then "traced" his lips to emphasize the comment. Harrison states her colleague Carol Menton called her after the call to discuss the "lips" comment, which Menton said "seemed suggestive."

Marlene Hostovsky states Respondent made a "lips comment" about an interpreter during a Zoom call but reports she did not recall the exact comment.

<u>Response</u>

Respondent denies making inappropriate comments about an interpreter's lips during a Zoom call. Respondent explains any comments he may have made about the visibility of the interpreter's lips in a clear face mask would have been relevant to the expression of ASL, which includes the mouth. Respondent states, "It wouldn't be about lips, it would include facial grammar on mouth and linguistics."

---

[7] Luckett declined to share details regarding these conversations, citing them as confidential due to union privilege. Luckett reports she provided the contact information of the undersigned to those employees who raised concerns.

c) **Touching Marlene Hostovsky's finger**

<u>Allegations</u>

Marlene Hostovsky alleges Respondent acted inappropriately while in his office during their initial one on one meeting after he started at MCDHH in 2019. Hostovsky reports Respondent was looking at a large map on a wall in his office, when he allegedly asked her where she lived on the map. Hostovsky reports she takes the same Commuter Rail line as Respondent, and lives in roughly the same area as he does.

Hostovsky states she went over to the map and pointed at the area where she lives. Hostovsky alleges the Respondent then got "physically close to her," touched his finger to her finger, and stated he also lives in the region. Hostovsky states Respondent had a "huge smile" as his "finger was close to [hers]." Hostovsky states the interaction made her uncomfortable, and states she felt "something is not right, [there was] some other meaning" behind Respondent's finger placement and body language. After Respondent asked her "What were you doing outside?" on another occasion, Hostovsky reports she began ignoring him on the Commuter Rail during her commute.

<u>Response</u>

The Respondent denies touching Hostovsky's finger on the map, or at any other time. Respondent states he has an "antique," "canvas map of the state of Massachusetts" in his office. Respondent states he was first "pointing [to] the office," when he asked Hostovsky, "Where do you live?" He states he does "not remember [the rest of] the conversation." Respondent states he "never touched [Hostovsky] at all," and explains he knows "her family, her sister, her brother-in-law."

2) <u>Allegations of discrimination based on Religion</u>

a) **Generally**

Complainant Jane Sokol Shulman alleges Respondent discriminated against her based on religion. Shulman explains she is "happy to be Jewish," and reports her religion is "a fundamental part of [her] identity." The bulk of Jane Sokol-Shulman's allegations of discrimination based on religion arise out of the Respondent's alleged involvement in the Kappa Gamma fraternity and subsequent June 22, 2020 call, which are outside of the purview of this investigation. Sokol-Shulman reports she raised her allegations with Chantal St. Fleur in the concurrent EOHHS investigation, including sharing the "full text of the [June 22nd] meeting with Chantal."

b) **Request to consider work-related matters during Rosh Hashanah**

<u>Allegations</u>

Jane Sokol-Shulman alleges Respondent engaged in discriminatory harassment by asking her to consider work-related matters while she was out of the office in observance of the 2019 Rosh Hashanah holiday. Sokol-Shulman reports Respondent told her, "While you're out, think about A, B, and C and we'll talk Thursday" upon her return from the holiday. Sokol-Shulman states she told the Respondent he was encroaching on her "cherished personal beliefs" by asking

her to consider work-related topics while she was out. Sokol-Shulman reports Respondent apologized after she informed him how she felt.

<u>Response</u>

Respondent states he does "not recall" asking Sokol-Shulman to "get back to" him over the Rosh Hashanah holiday.

3) <u>Allegations of discrimination based on Race</u>

**c) Generally**

Many of the interviewed employees allege Respondent discriminates against MCDHH employees based on race. Particularly against the backdrop of the June 22, 2020 call, many employees felt "triggered" by Respondent's alleged involvement with Kappa Gamma, including the alleged racist components of the organization.

Black MCDHH employees, in particular, expressed discomfort around Respondent, and linked it to their membership in a protected class based on their race and/or ethnicity. Janay Mitchell, a Black employee, states she "unfortunately" must work with Respondent on occasion. Mitchell states she "feel[s] looked down upon" by Respondent, and shares, "I'm young, I'm Black, I'm a woman. [There are] some situations where his approach is not professional." Mitchell states she is unable to remember specific incidents of discriminatory behavior, because she "suppress[es]" Respondent's comments and "go[es] blank" every time she interacts with Respondent. Mitchell became emotional while explaining, "I have to admit, every time I interact with him, I go blank." Mitchell states she has not raised her concerns prior to this investigation due to "fear of retaliation."

Terry Malcolm reports Janay Michell seemed "crestfallen" one day in the office, and reported to her that Respondent "made [her] so, so mad." Malcolm states Mitchell refused to elaborate on or report the alleged incident, telling Malcom "No, no, no. I don't want to because I'm Black and my boss is Black." Malcolm reports Mitchell told her on another occasion that Respondent treats her and her supervisor differently than other employees because they are both Black, and it "seemed race related or [like] racism."

Aurora Wilber reports Respondent "avoids people of color." She states Respondent "stopped speaking" to Janay Mitchell, and told Wilber "I'm not going to waste any time on her" because "she is going to leave."[8] Wilber also reports Respondent became "fascinated" by the experiences of People of Color before the pandemic, and frequently brought up the term "POC."

Emails provided to the undersigned by the Respondent illustrate Respondent's usage of the term "POC:"

---

[8] Mitchell was studying for her degree and had an approved flexible work schedule to accommodate her school schedule.

| | |
|---|---|
| **From:** | Florio, Steven (MCD) |
| **Sent:** | Friday, November 22, 2019 3:56 PM |
| **To:** | Hanigan, Ami (MCD) |
| **Subject:** | Reaching out to James Wiggins |

Hana-

James Wiggins, POC interpreter, wanted to set up a meeting with me generally about the POC issues and opportunities.  Please contact him by emailing at Athmysts@gmail.com and see if he has preferred dates for us to meet.  He can bring anyone in and identify meeting location to meet.

I do look forward to meeting with him.  December or January would be fine with me.

Thank you,
Steve

When asked whether he had witnessed the Respondent engage in discrimination based on race, O'Dell stated the Respondent is "autocratic." O'Dell reports, "As a trainer, [it is] hard to go out and say, 'not to discriminate.' It is awkward to represent [Respondent], 'Do as I say, not what my leadership did in the past." O'Dell characterizes this "schism" as "uncomfortable."

Conversely, Edgar Herrera, who identifies as Venezuelan, reports Respondent is "not at all" discriminatory to employees based on race. Herrera reports Respondent "is not that kind of person" and has been "very supportive of getting [ethnically diverse] interpreters."

Christine West, Respondent's interpreter of approximately eighteen years, reports she has not witnessed Respondent treat people of color differently. Rather, West reports the "agency" did not "set diversity as priority." West states, "I'm a person of color, the fact that he's chosen to work with me" shows Respondent is not racist or discriminatory on the basis of race. West reports, "having an interpreter of color sends a statement." West states conversations surrounding diversity and inclusion at the Commission "did not seem like something people could talk about safely and comfortably," though Respondent "tried to provide opportunities" to do so. West states she is "not sure if [employees] are uncomfortable because he's asking those questions, if they are defensive, [or] not forthcoming."

**d) Discriminatory Harassment**

   *i.   Asking minority employees about their experiences*

<u>Allegations</u>

Aurora Wilber reports Respondent "went to all [employees] of color and asked them, 'What it's like' being Black. Aurora states she was "alarmed" and "creeped out" by Respondent's questions. Ford states Respondent "went to Black staff" and asked, "How does it feel being Black?" Ford reports Respondent "ignored" Mekuria' s "robust diversity plan," and instead took it upon himself without clearance from Human Resources to approach Black employees. Ford states she and Mekuria approached Respondent and told him his approach was "not okay."

Mitchell reports Respondent was "walking by her office, casually, stopped, looked in, and asked, 'How do you feel about hosting a meeting with Black people?'" Mitchell explains,

"My role is a Human Resource role. I'm very involved and know [employee's] identities, which is confidential information. I was definitely thrown off by the question, because one, what red flag or concern do you have for the agency that prompts you to ask the question? That made me uncomfortable. And of course, I wanted to know the intent of the question. My response was basically, 'Okay, I can't say yes because I really want to know why. What's the reason for the meeting?' He of course stopped and couldn't provide an accurate response to the question and walked away." Mitchell reports, "Of course I got emotional, like, 'Am I doing something wrong?' Because I've always felt uncomfortable, because of the way he interacts with someone like me, [a woman of color], as opposed to other people.

Sehin Mekuria reports Respondent told her he is "trying to do something about People of Color" at the agency, and states she replied, "Well, I actually heard already about you asking other individuals, and that's when I addressed to him, that, you should not be asking us to actually get involved, you should just pick up on us…you should just do it over all the agency." Mekuria also states one of her direct reports came to her alleging Respondent made similar comments to her, unsolicited. Mekuria reports her employee expressed she was "uncomfortable" with Respondent's questions, and Mekuria states she again told Respondent, "It is not good for you to go around and ask the people who are already affected by issues surrounding diversity and inclusion. Mekuria stated, "What's his problem? If you want to address diversity there are a lot of other ways…You don't go up to Black people asking about diversity." Mekuria wonders if Respondent "ha[s] some issues" regarding ethnic minorities and approaching diversity and inclusion appropriately.

When asked whether Respondent asked him, "What's it like to be Black?" Tony Harrison stated Respondent did "not [use] that line," but "in other ways" functionally asked the same question. Harrison reports Respondent has asked him, in the office, "How do you feel about Diversity? How would you promote inclusion in the workplace?"

Karin Eddy states employees reported to her that Respondent said, "You're a person of color, what can we do to engage you?"

Response

When asked whether he asked Black staff, "What is it like being Black," Respondent stated he "did not phrase it that way." Respondent explains "the Commission never had a diversity affinity group," and reports there was "no opportunity to discuss race." Respondent reports he consequently "thought of four names that could bring [a] Deaf and Black perspective, talking about racism." Respondent states, "I reached out to Sehin, I reached out to Janay, I reached out to Tony, I reached out to Christine West, just to get a sense of what we could do for an affinity group discussion. We had some brainstorming discussions, some folks were saying, 'We don't need that, why do we have to deal with that issue,' some folks said 'We should make it a diversity group, not just people of color but include gay and lesbian folks, religious, and other diversity.'"

Respondent states he approached Black staff in an attempt to start a conversation about diversity and inclusion and reports his "intention was to set up a group" to discuss these issues.

Respondent reports he held a meeting with interpreters of color in December 2019, who he characterized as "African American, Latinx, etc." In the meeting, Respondent states "they talked to each other, I realized it was a missed opportunity [that the Commission did not hold

similar meetings earlier]. I should've grabbed [the opportunity] and been more encouraging, not just good enough."

Respondent states that "people had not been ready to talk about" race and diversity, and states there "never" was a "safe space" at MCDHH prior to his arrival. He states there were "no affinity group discussions and no opportunities for folks to talk about race" in the past. Respondent states Christine West expressed concern about her experience as a staff interpreter of color. Respondent states he referred West to HR Liaison Karin Eddy. Respondent states he reported to Eddy that the current MCDHH "'environment' is not conducive to [West]."

In his response to the undersigned's question, Respondent shared an incident that occurred in November 2019, in which Professor Cornel West came to speak in Boston and requested help from Respondent to find an interpreter for the event. Respondent states:

> "I'm looking back to November 2019, where issues came up with Cornel West…who contacted me for an interpreter referral. I was able to finally get Denise Martinez who was willing to interpret his event. Afterwards, there were interpreters of color who were very, very upset because they weren't contacted, and there were a few who were available who were not contacted. There was an issue of having a white interpreter interpret for this very prominent African American presenter. I was asked for a meeting and I was fine, asked my assistant Hana to schedule it… I asked Christine West to come, because she is the only interpreter of color on our staff, I asked her to join the meeting….[We all]met…they wanted my ear, there was no agenda, we just talked to each other. I realized there was a lot of missed opportunities…that there was not a lot of diversity interpreting at this level…I learned after the fact that [interpreters of color] were not on the list [of available interpreters for the Cornel West event]."

Additionally, Respondent reports he held a meeting in December 2019 for interpreters of color to discuss the Cornel West event and learn from their perspectives At the meeting, Respondent states, "I gave everybody a small gift, $5 worth of Legos to use as a fidget [during the meeting]. My whole hope was that people would take it as an opportunity to build things together and move forward." At the meeting, Respondent reports the interpreters told him, "the Commission is well known for not talking to marginalized groups." Respondent reports that this reputation of MCDHH was "news to [him]."

> ii.   Comments about "color"

Allegations

Cheryl Keeter, a freelance interpreter who has worked as Respondent's interpreter "pretty frequently," alleges Respondent made comments about "color" in the hallway of the Boston office in Summer 2019. Keeter states she and Respondent were discussing an Asian interpreter applicant, when Respondent said, "We should get more color in here. Color looks good on us." Keeter reports she took Respondent's use of "color" to mean racial/ethnic diversity.

Wilber reports she witnessed Respondent say "color looks good here" while he was standing with a group of interpreters, one of whom was a "person of color"

Eddy reports it is an "ongoing thing for [Respondent] to talk about POC, POC

everything."[9] Eddy offers an example in which Respondent brought an employee's race/ethnicity into a conversation completely unrelated to their race/ethnicity. When Eddy brought up the staff member's concern that had nothing to do with their membership in a protected class, Respondent allegedly said "We have to act because they are a POC." Eddy's states she responded, "No, we have to respond because they are staff."

On another occasion, Eddy states Respondent told her "we need to bring POC" to an external meeting. After Eddy asked why employees of color needed to attend, and if there were topics or skillsets specific to certain employees, Eddy explained Respondent kept insisting on "POC" attendance for the sake of them being persons of color. Eddy describes Respondent as "missing the ask," and as "wanting diversity just [for the sake of] 'diversity,' not because of a specific subject."

<u>Response</u>

When asked whether he said, "Color looks good here," Respondent replied, "Wow. Where, who would I have been speaking with, I have no idea, where did that happen? No, I don't know. I mean are you talking about like a painting or something, I might have said something about a decoration, you know, clothing. I can't think of any time I would've made a comment like that."

After the undersigned specified the context, with 'color' insinuating someone's perceived racial or ethnic background, Respondent replied, "No, I would not have said that. No, I did not. No."

      *iii.*    *"We have too many white women who are hearing."*

<u>Allegations</u>

Denise Martinez reports Respondent said there is a "big problem" that 35% of MCDHH staff are "hearing women" on one of the June 22, 2020 calls. Martinez reports Respondent was "furthering the divide" between MCDHH employees. Eddy states Martinez complained to her that Respondent said "we have too many white women who are hearing" to a group of majority white, hearing meeting.

<u>Response</u>

Respondent denied saying there are "too many white women who are hearing. He states he is "looking for more opportunity for people of color," and would not have made comments regarding "too many white women."

In a follow-up email to the undersigned, Respondent wrote:

*One of your questions was "Too many women" at one point. The setting of that accusation is not clear to me. Over the weekend, I realized it might be related to this screening redesign meeting. On May 27, 2020, we had a meeting to discuss how we go forward with the screening redesign process.*

---

[9] Respondent uses the abbreviation POC to denote Person(s) Of Color.

*Denise Martinez and Janice Cagan-Teuber told us that they intended to design and lead the redesign process and will eventually invite additional people later during the process.*

*I told them that from a public perception (the interpreter community), they may view this process to be lacking diversity because Janice and Denise are white, hearing, and women.  I encourage that the team should be made up of all diverse individuals who are expertise in the field of interpreting including People of color, Deaf, and men.  I recommended that we should have a diverse screening redesign team from day 1 and they can start brainstorming what the process looks like so they could feel "buy-in" and ownership of the process from start to end.*

*I mentioned this because in the interpreter community, according to the Registry of Interpreters of the Deaf (RID), a national professional interpreter organization, 2017 Annual Report Membership Demographics (self-report), the representation is clearly a disproportion*

**e)  Disparate Treatment**

  i.  *Dress code*

<u>Allegations</u>

Janay Mitchell reports she was "personal[ly] attack[ed]" by Respondent after her outfit on October 25, 2019, a Casual Friday, prompted Respondent to enact a dress code. Mitchell states she was wearing "an outfit [she] normally [would] wear" at any time during her "six year" tenure at the Commission" on Casual Friday. Mitchell states she was wearing "blue jeans, olive green shoes, and a matching shirt with a Puma [logo] on it." Mitchell reports her Supervisor, Sehin Mekuria, would "tell [her] it was not right" had Mitchell worn something inappropriate.

That day, Mitchell states she "witnessed [Respondent] go into [Mekuria's] office" after he passed by Mitchell. Mitchell reports Respondent "went in there, closed the door, [and stayed] for a couple of minutes. [She felt] something is not right." She states then went into Tricia Ford's office alongside Mekuria. Mitchell recounts, "I was called in the office, they basically said they wanted to take a picture of my shirt, and I said, 'Oh, is there something wrong with my outfit should I go home and change?' [Mekuria responded], 'Oh, no! We just want to take a picture of your shirt to try and clear up some things.'" Mitchell states they wanted to "send the shirt [photograph] to the ADA office to see if it's 'okay.'" Mitchell reports Mekuria was "very supportive" and asked her to "relax." Mitchell states she responded, "No, I need to go home and change my clothes if something is wrong." Mitchell reports she then "volunteered to go home and returned with a solid blouse."

Mitchell states "no one approached" her after she returned to the office. Some time after, Mitchell reports she received an email regarding "professional attire in the office" containing the new dress code. She reports, "You couldn't tell me what was wrong that day, but you send out a policy to everyone, and course that had the agency wondering, 'What was that about?'" Mitchell states her outfit was not inappropriate that day, and that "other coworkers wear leggings, clothes that you wouldn't call professional clothing" to the office. Mitchell states there "was no dress code" before, and felt "uncomfortable" that Respondent enacted one after he raised concerns

about her October 25, 2019 outfit.[10] Mitchell reports she has "never seen" Respondent approach the non-Black employees wearing leggings.

Martinez states Respondent enacted the dress code "in response to a Black woman's [Janay Mitchell's] attire." Kathryn Luckett explains there "never was a dress code" prior to November 13, 2019 code, as there are "no outward-facing" jobs at the Boston office. Luckett explains other white employees have worn logos on t-shirts without any repercussion and cites a white employee who "wears Michael Kors [logos] and is white."

Ford reports employee Kristin Johnson "complained" to Respondent about Mitchell's attire, jeans and a shirt, on the same October 25 Casual Friday. Ford states Respondent was "adamant [employees] should not wear t-shirts with names," but speculates it was because Puma is a "culturally Black" brand.[11]

Prior to the release of the November 13, 2019 Dress Code, Respondent had drafted a Dress Code policy that was not distributed to MCDHH. It reads, in pertinent part:

As is current practice, a professional appearance must be maintained at all times while avoiding clothing that is overly casual, revealing, or inappropriate for the workplace. Clothing must be clean, neat, and in good condition (free from rips, holes, tears, frayed edges, and missing buttons). Clothing should be free of pictures or words that are offensive, profane, explicit, or relate to alcohol, tobacco or illegal substances, politics, or personal views.
Jeans/denim pants are allowed year-round on Fridays provided they are worn in a manner that is not revealing or inappropriate for the workplace. T-shirts, shorts, sweat suits, and flip flops should not be worn while working.

The November 13, 2019 Dress Code reads in pertinent part:

As is current practice, a professional appearance must be maintained at all times.  Clothing must be clean, neat, and in good condition (free from rips, holes, tears, frayed edges, and missing buttons). Clothing should be free of pictures or words that are offensive, profane, explicit, or relate to alcohol, tobacco or illegal substances. Clothing containing logos or slogans stating, representing, or associated with politics, controversial social movements, and strongly-held personal viewpoints are prohibited in the workplace, as is clothing that is overly casual, revealing, or generally inappropriate for the workplace.  Shorts, sweat suits, and flip flops should not be worn during business hours.

<u>Response</u>

Respondent states he was not fully responsible for the dress code drafting and implementation, and denies targeting Janay. He states Diane Shearer, a former Commonwealth employee, told him she "saw an employee with a t-shirt with graphics [on it] and sweatpants. [Shearer] stated 'She did not look professional,' and complained" to Respondent. He states he the "leadership team," and MCDHH attorneys Josh Mendelsohn and Molly Karp then worked on drafting the new policy, as "people [were] uncomfortable enforcing [the old] policy," which he

---

[10] Respondent had drafted a dress code policy to send to MCDHH employees as of August 2019, but never sent it to staff.
[11] https://www.reuters.com/article/us-puma-de-usa/puma-commemorates-black-power-salute-in-u-s-market-push-idUSKCN1ML274

deemed "vague."[12]

Respondent admits "some staff [were] feeling like they were called out," but maintains he did not "target" any employee(s). Respondent states he was "concerned about outside visitors" coming to the office and making sure MCDHH employees "look[ed] professional."

### f) Tokenism

#### i. Tony Harrison

<u>Allegations</u>

Tony Harrison reports he is concerned about Respondent engaging in "tokenism." Harrison states it "wasn't direct discrimination," but reports Respondent would "come up to [him] because I'm Black and Deaf." Harrison states Respondent would ask him "about Black History Month" and "about diversity," and estimates the tokenizing conduct occurred "no more than 5 times." Harrison questions, "Why is he singling me out? I don't know his intention." Tony states "Maybe because I'm Deaf and Black, my deafness trumps my identity as Black" to Respondent, as Respondent has exclusively sought him out to ask questions about his opinion on diversity in the office, and because Respondent exclusively asked him to work on the Black History Month project.

Dubler states he has not witnessed Respondent discriminate against minority employees at work, but reports Respondent made Tony Harrison a "token" at the 2019 Christmas party, by inviting him to the event as one of only a few MCDHH employees and sitting near Harrison while introducing him to others throughout the evening. Dubler reports Harrison "did not look comfortable" and "seemed stilted" at the party, a contrast to his "totally different, friendly, outgoing" demeanor in "community events." Dubler states Harrison was "sitting next to" Respondent, who was dismissive to Harrison, stating "Oh, [Harrison] doesn't have family" as if Respondent "felt bad for him, like, 'poor guy.'" Dubler reports the "dynamic" between Respondent and Harrison "did not seem healthy"

<u>Response</u>

Respondent denies engaging in tokenism. He states he invited Tony Harrison to his holiday party as a kind gesture, as Harrison would otherwise be alone for the holiday. Respondent reports "everyone had a good time" at the party and states he "can't control" how people interpret his intentions.

When asked whether he invited Harrison to the event to increase diversity, Respondent reported, "No, I don't even think that way. I just feel like, you know…he was alone for the holidays, I invited him over if he wanted. It was certainly not my intention to tokenize anyone. This is my home it has nothing to do with work…I can't control that. Obviously, everybody has their own opinion."

---

[12] In emails to the undersigned, Respondent shared a "Draft Email for Staff on Dress Code" dated August 2019, but the email was not sent out to MCDHH staff. d

*ii.    Stephanie Hakulin*

On May 30, 2020 Stephanie Hakulin interpreted for Boston Mayor Marty Walsh. This marked the first time a female Black Certified Deaf Interpreter appeared on television interpreting for the mayor.

<u>Allegations</u>

After Hakulin made appearances with Mayor Walsh on May 30 and June 1, 2020, Ford states Respondent "wanted to do a 'story on'" Hakulin, and was "insisting" despite Wilber's objections that it would be inappropriate for the agency to initiate a story when appropriate PR channels exist. Ford states Wilber involved Sonia Bryan, from the EOHHS Diversity office, who Ford alleges told Respondent to "absolutely not" go forward with a story, as it "felt like tokenism."

Hana Hanigan reports Aurora Wilber "kept explaining [to Respondent], '[creating a story about Hakulin] is probably not appropriate.'" After Respondent proposed the feature on Hakulin, Aurora Wilber, who manages Public Relations projects, cautioned Respondent from "creating" the story. Wilber reports she told Respondent to request approval from EOHHS, and alleges he respondent, "I don't need to."

Hanigan states he did not initially comply with Wilber's requests to stop pursuing the story, but ultimately conceded after Karin Eddy brought the idea "to the diversity group." Hanigan explains, "People noticed [Hakulin was interpreting for Mayor Walsh]. To highlight it would feel cheap. [It] feels like he would be bringing out a pony, [with] him taking the prestige. It didn't feel genuine."

---

**From:** Florio, Steven (MCD) <Steven.Florio@mass.gov>
**Sent:** Monday, June 1, 2020 3:27 PM
**To:** Wilber, Aurora (MCD) <aurora.wilber@mass.gov>
**Cc:** Hanigan, Ami (MCD) <ami.hanigan@mass.gov>; Ford, Patricia (MCD) <patricia.ford@mass.gov>
**Subject:** Stephanie Hakulin - CDI TV Press Conference

Aurora-

Can you please create a story about Stephanie Hakulin who is the first Deaf POC CDI at TV Press Conference in Massachusetts?  She appeared last Saturday as well as this afternoon both for Mayor Walsh's TV Press Conference.   Maybe get a quote from her, investigate the fact that she is the first POC person (or she prefers to be called differently such as African American, Black, etc.), and get a quote from me on behalf of MCDHH…

Thank you,
Steve

**From:** Wilber, Aurora (MCD) <aurora.wilber@mass.gov>
**Sent:** Monday, June 1, 2020 8:39 PM
**To:** Florio, Steven (MCD) <Steven.Florio@mass.gov>
**Cc:** Hanigan, Ami (MCD) <ami.hanigan@mass.gov>; Ford, Patricia (MCD) <patricia.ford@mass.gov>
**Subject:** RE: Stephanie Hakulin - CDI TV Press Conference

Hi Steve,
It's not best practice for MCDHH to create a story for another agency.  MSAD has both a VP for public relations and a board member who focuses on media. They should draft an article that includes a quote from you, I'm happy to review when it's ready. We can promote the article by sending to our community network lists.
Aurora

**From:** Florio, Steven (MCD) <Steven.Florio@mass.gov>
**Sent:** Monday, June 1, 2020 9:59 PM
**To:** Wilber, Aurora (MCD) <aurora.wilber@mass.gov>
**Cc:** Hanigan, Ami (MCD) <ami.hanigan@mass.gov>; Ford, Patricia (MCD) <patricia.ford@mass.gov>
**Subject:** RE: Stephanie Hakulin - CDI TV Press Conference

Aurora-

I am lost.  What is another agency?  The article is from MCDHH for the community.

Steve

**From:** Wilber, Aurora (MCD) <aurora.wilber@mass.gov>
**Sent:** Monday, June 1, 2020 10:04 PM
**To:** Florio, Steven (MCD) <Steven.Florio@mass.gov>
**Cc:** Hanigan, Ami (MCD) <ami.hanigan@mass.gov>; Ford, Patricia (MCD) <patricia.ford@mass.gov>
**Subject:** RE: Stephanie Hakulin - CDI TV Press Conference

The article should be written by MSAD and include a quote from you.  I don't think we should be writing an article for them, they have staff for that and should take pride as an accomplishment for Stephanie and MSAD.

| **From:** | Florio, Steven (MCD) |
|---|---|
| **Sent:** | Monday, June 1, 2020 10:10 PM |
| **To:** | Wilber, Aurora (MCD) |
| **Cc:** | Hanigan, Ami (MCD); Ford, Patricia (MCD) |
| **Subject:** | RE: Stephanie Hakulin - CDI TV Press Conference |

This has nothing to do with MSAD, unless you know they plan to write about her.   Her professional as a CDI has nothing to do with MSAD.  She happens to be the President of MSAD.

I am more than happy to discuss with you over Zoom sometimes this week.

Steve

<u>Response</u>

Respondent denies any wrongdoing in attempting to "spotlight first female interpreter of color." Respondent explains, "From my perspective, [the Hakulin story was a] positive thing." Respondent states he regrets not pursuing the "spotlight" feature, and states, "It should've been taken and run [with], [and] not have received as much pushback" as it did.

**g) Lowell Program**

Allegations

Ford alleges Respondent eliminated a program for Hispanic youth to train as interpreters. Ford explains MCDHH historically supported a pipeline program for Hispanic students in the Lowell area to pursue careers in interpreting. The program supported Hispanic students through coursework at the high school level, then at Essex Community College, to ultimately culminate in a degree in interpreting from Framingham State. Ford reports Respondent suspended the program, and wonders whether he was "purposefully putting barriers up" to prevent the influx of new interpreters of color, as "not many people of color come into the field" currently.

Response

Respondent denies cancelling the Lowell pipeline program. Regarding the program, Respondent states he "was consulting on that, [but] that was a DESE/MCDHH venture.[13] There was no ongoing involvement. There was workforce development, but I wasn't formally connected to it." Respondent reports, "MCDHH never actually did a comprehension approach to workforce development, to try to expand the pool. A lot of times we've had some band-aid solutions"

4) Allegations of discrimination based on Gender

**a) Generally**

During the investigation, all interviewed MCDHH employees, save three, described Respondent's behavior and rapport with staff negatively. Generally, employees characterized the Respondent as rude, dismissive, and condescending to women. Employees assert Respondent created a hostile work environment in which female employees are not respected or heard.

Jane Sokol-Shulman states it is "hard to address" whether the Respondent discriminates based on gender, as "women are so far in the majority" at the Commission. However, Sokol-Shulman reports Respondent has been "enormously difficult" to work with and reports he "did not take advantage of the skills of [his] team."

Carol Menton describes Respondent as a "relic" of former patriarchal workplaces. Menton states Respondent has "a sense of privilege, of male entitlement" and there has been "a lot of division since he arrived." Allison Fondo shares, "sometimes being a woman, you take things as normal" that may be, objectively, problematic. Fondo explains Respondent is "condescending" in the "case management meetings, [in which the employees] are all women."

Hana Hanigan, Respondent's Executive Assistant, states Respondent "doesn't talk to [her], maybe [talks to her] half an hour a week." Hanigan reports she does "not feel like [she] was being listened to" as a woman, and reports passing her suggestions through Johnathan O'Dell, her male coworker, who she reports the Respondent responds to readily. In Executive Team meetings, where Respondent is the only male, Hanigan reports she felt "awkward." Hanigan reports "his dealings were [in] monologue, [and] it didn't feel like a team." Hanigan reports it "didn't feel like [Respondent] listened to" the Executive Team members, who were all female.

---

[13] DESE is the Massachusetts Department of Elementary and Secondary Education.

Karin Eddy reports Respondent is "arrogant and dismissive" towards women. Tricia Ford describes Respondent as "absolutely sexist" and "disrespectful" to her and the other female Deputy Commissioner, Sehin Mekuria. Denise Martinez reports Respondent has "recently started golfing with men at the Commission," but has not invited female employees to golf.

Conversely, Edgar Herrera, a male MCDHH employee, notes there are "only six men" are on staff at MCDHH. Herrera states there is "perhaps a style difference" with how Respondent treats men but does not believe Respondent discriminates against women.

Kristin Johnson, a Deaf woman, reports Respondent does not treat women differently than men. Johnson describes Respondent as "the big boss" who is "very positive," has "excellent communication," and "an excellent team work ethic. Johnson states she believes Respondent is "fair" to her as a woman and does "not think he has been involved in" any potential violations of policies investigated by the COE."

Johnson states she believes Respondent is being "set up," and everyone is "pointing fingers" at the Respondent for agency-wide issues. Johnson likens the agency to the "White House as it's being run under President Trump," however maintains that it is the agency itself, not the Respondent, that is responsible for the current climate therein. Johnson states Deputy Commissioner Tricia Ford is the President Trump in her MCDHH comparison. When asked specifically whether she believes the Respondent contributed at all to the MCDHH as described, Johnson deflected the question and responded that the issue at the agency is "systemic oppression" of the Deaf.

### b) Disparate treatment

#### i. *Lack of female involvement in Black History Month project*

<u>Allegations</u>

Tony Harrison reports Respondent "asked [Harrison] to help him with some type of newsletter" to be distributed during Black History Month. Harrison reports Respondent did not ask his two Black women coworkers to work on the project. Harrison reports his colleague approached him and state, "Wait, I haven't been asked" to work on the Black History Month project. Harrison states, "Afterwards, it struck me as odd, [that the] two people, both black women" were not asked to work on the project. Harrison states he "want[s] to make sure [his] colleagues feel safe…[and] happy" at the Commission.

Janay Mitchell states Respondent did not include her in the Black History Month project in February 2020.She reports Respondent "approached one male staff of color and asked him to take on the project, instead of a…group effort." Mitchell reports, "Of course I felt a little offended, I wanted to contribute too." Mitchell continues, "There are four weeks in a month. How you can ask one person to take on that kind of thing?" Mitchell states the Respondent displayed "favoritism, sexism" in this decision, and questions, "You can't ask a female?" to contribute. Mitchell states she did not complain, but felt "something isn't right in terms of [Respondent] is delegating projects," as the individual he approached was "the only black male in the agency" and had been at the agency for one year, compared to Mitchell's six years.

Response

Respondent he states "asked Tony, just Tony" to participate in the Black History Month project. When asked why he only asked Tony, Respondent said, "Tony initiated contact in the past" about wanting to work on new projects, so he sought out Tony for the project.

### ii.   Dismissive to women in meetings

Allegations

Staff alleged Respondent disrespects and dismisses women in departmental meetings where the department is all-female. Mekuria reports Respondent "never respected" the women on the Executive Team. Mekuria states Respondent would "fact-check" the female managers and would "sometimes" apologize for it when she would question this practice "to his face. "Aurora Wilber states Respondent was "challenging" and "negative" during "every" management meeting regarding her DPH project. Sharon Harrison states Respondent "offended" the female employees in department meetings, by "asking [them] to do more work."

Eddy reports Respondent "does not want to take advice" from women in meetings. Eddy characterizes Respondent as "inappropriate without realizing it" and explains he often "miss[es] non-verbal cues" from women who are uncomfortable. Eddy states Respondent will "call on men in meetings, even if women are the subject matter experts."

Ford reports Respondent "did not bring" Deputy Commissioner and Chief Financial Officer to the statewide budget meeting. Ford states Respondent dos "not want [Mekuria's] opinion," and points to her gender as the reason.

Response

Respondent states he "calls on everyone equally" in meetings, and that meetings follow the "ground rules" for communication access, which directs parties "raise [their] hand" to participate.

### iii.   Public acknowledgments: difference between men and women

Allegations

During a virtual press conference training for interpreters, Jesse "Rupert" Dubler, male MCDHH employee, reports Respondent made a public comment during a break thanking him for his work. Dubler reports Respondent signed, " 'Rupert, thank you for all your hard work,' then signed a fist bump, like 'bro.' " Dubler thought it was strange Respondent would make that statement "into the internet, representing the agency because [the training] was nationwide." Dubler's female colleague, Lori, was also present in the training. Dubler states Respondent did not immediately thank her, and states Respondent's eventual expressed gratitude to Lori was an "afterthought"

Elsewhere, Fondo reports he has "never congratulated [the all-female] Case Management" department, despite congratulating the other departments during various staff meetings.

Sharon Harrison reports s her all-female department was forced to "say thank you" to Respondent on a call in late May. Harrison states Kristin Johnson "asked interpreters to say 'Thank You'" to the Respondent for all his work. Harrison reports the staff was "visibly shocked" that they were asked to praise Respondent, without ever being praised in turn.

Carol Menton reports Respondent joined a meeting, and stated he was "checking in to make sure everyone is working," and to request praise for his work. Menton states his insinuation that the all-female department was not working was offensive as, they all "have been working nonstop." Menton explains, "What do you want [them] to thank him for?"

<u>Response</u>

Respondent denies asking staff for credit. Respondent states he does "not want credit," and instead wants "the people around" him to get credit for work at the agency.

       *iv.*   *Informal "chats" with men only*

<u>Allegations</u>

Hostovsky reports Respondent "talks to male [employees] instead of his own female assistant." Hostovsky characterizes Respondent's dismissal of his female assistant as "frequent." Keeter sates Respondent "stops to chat" with "mostly men."

Hanigan reports Respondent initially had an "open door policy," but as time progressed, reports he began requiring employees schedule appointments with Hanigan and provide a proposed agenda before accepting the meeting. Hanigan states Respondent began restricting which employees were able to go to his office without a scheduled appointment. Hanigan states the list is getting "smaller" "based on who was speaking out against" Respondent, as more MCDHH employees openly questioned Respondent's conduct.

<u>Response</u>

Respondent reports he has a full "open door policy." Respondent characterizes himself as more open than previous Commissioners, explaining "three [MCDHH employees] said they had never been in the office" during previous Commissioners' tenures.

**c) Discriminatory harassment**

<u>Allegations</u>

Hostovsky reports Respondent is constantly "putting down women" in his interactions, including by allowing the vlogs to be produced by "all men."

Malcolm reports Respondent "looked down upon [her] because [she is a woman], and not intellectual or educated." Malcolm states she has known Respondent for a "long time" since he worked in Rhode Island and states she "never felt comfortable around him."

Eddy reports Respondent will "give a summary" of the topic she is presenting "before [she] can speak." Eddy states this behavior is "dismissive," and reports she "never got feedback" from him, only continual dismissiveness. Additionally, Eddy reports Respondent put her down

after she and Edgar Herrera made a similar comment about their alma mater. After the comment, Eddy reports Respondent "call[ed] [her] out, and not [Herrera]." Eddy provides this as an example of Respondent treats women differently.

Jonathan O'Dell reports he has heard the Respondent say "this is our female staff" when Respondent introduced a new colleague to the group, and states Respondent has said "here comes our female" when referring to women employees. However, O'Dell reports there is "sometimes interpreter error" that can add in gender qualifiers that Respondent did not express himself in sign.

<u>Response</u>

When asked whether gender-based concerns were raised to him, Respondent replied he had, by Christine West exclusively. Respondent suggested I ask West and "pick [the] brain" of his assistant, Hana Hanigan, who "work[s] with [him] everyday…and see[s] what's going on."

5) <u>Allegations of discrimination based on disability</u>

a) **Generally**

The vast majority of interviewed employees allege Respondent treats Deaf employees who use ASL different, and better, than Deaf employees who speak and Hard of Hearing employees. Shannon Silvestri, a Hard of Hearing employee, reports it "feels like we should have two separate Commissions," because Respondent "do[es] not focus on Hard of Hearing. Silvestri states Respondent's lack of interest and support to the Hard of Hearing is "doing disservice to other folks." Silvestri states Respondent has created "a lot of anger and resentment" by "calling out" employees who are "not ASL fluent."

Dubler, who is Deaf, reports Respondent treats ASL users better than employees who do not use ASL. Dubler states Respondent said, "he was sick of hearing employees oppress Deaf employees." When asked whether Respondent treats those who sign different, Hostovsky responded, "Yes! Yes! Yes! Since the very first day." Ford states Respondent has championed a "very strong deaf-centric" culture at the Commission.

Herrera notes Respondent "is the first Deaf, non-speaking" Commissioner, which "for some people can be a little jarring." Herrera reports Respondent is "straightforward" and "less relaxed" than previous Commissioners, which he believes might be challenging for some of his coworkers. Herrera explains the frustration may be due in part to Respondent, who "signs quickly, is very culturally Deaf, [and has] a different way of communicating."

b) **ASL Exclusivity**

     i.   *"Deaf is best"*

<u>Allegations</u>

Karin Eddy reports there is an "overt and covert" culture cultivated by the Respondent, that "If you're not Deaf, [specifically] auditory Deafness and an ASL User, you're an oppressor." Eddy, who is Deaf and speaks, states she "was told by him that I could be an oppressor."

Further, Tony Harrison alleges Respondent was "rallying, 'Yay, we're all Deaf!" rather than including Hard of Hearing staff as well.

Response

Respondent denies saying "Deaf is Best." However, Respondent explains that "hearing people have privilege," and shifting to a Commissioner who is "100% Deaf is a big shift" for agency employees. Respondent provided the undersigned several articles regarding Audism and Phonocentrism accompanied with the following comment explanation:

> During the interview, you are asking me several questions like "Deaf is best", "preferred sign language", as well as other similar themes. I thought it is important for you to understand what Audism and Phonocentrism are all about. Yes, racism is about oppression on race, sexism is about oppression on gender, etc. Audism is about oppression on people who could not hear at all or not very well. The other word is Phonocentrism. This is about oppression on people who could not speak at all or not very well intelligently. It would be great if you take time to gain an understanding of what these words mean and what most of us, if not all, deaf and hard of hearing employees at MCDHH, may be currently experiencing.

Respondent initially stated he "gravitates" towards Deaf people, but backtracked after the undersigned relayed the interpretation back to Respondent. Respondent then stated he "never said" he gravitates towards Deaf employees "necessarily," and explains, "I don't feel I gravitate towards any particular group."

> ii.  Focusing on 'Deaf' and ignoring 'Hard of Hearing' employees and constituents[14]

Allegations

Dubler reports Respondent is focusing on the "D" for Deaf in MCDHH, and not the "HH," for Hard of Hearing. Dubler reports Respondent once said, "It's important to keep Hard of Hearing [employees] in mind, but it's time to focus on Deaf [employees.] [The] Hard of Hearing time will come later." David Del Pizzo reports, "because [Respondent] is Deaf and uses ASL, he focuses on Deaf. Before [the agency] was hearing focused…. He is Deaf-Centric." Jonathan O'Dell reports Respondent "based [employees'] validity on form of hearing loss."

Silvestri reports Respondent refers to non-Deaf staff as "hearing" coworkers and "hearing" staff, while he does not use qualifiers when talking about Deaf staff. Silvestri also alleges that Respondent "had to be told [she] was hard of hearing" for him to communicate with her via her preferred communication methods.

Sokol-Shulman states Respondent "favors Deaf" employees. She states Respondent and other employees "characterize [her] as hearing," even though she is "audiologically" compromised. Sokol-Shulman states Respondent is "much more lax and tolerant" of Deaf

---

[14] The allegations regarding the treatment of non-employee Community members are outside the scope of this investigation, as the COE only investigates alleged policy violation against Commonwealth employees.

employees than of hard of hearing or hearing employees.

Tony Harrison reports there is "concern from Hard of Hearing people that they're not being preferred, [that the Respondent] is not approaching them." Harrison states he is able to "know [Respondent] better, because he's Deaf, than others at a loss with ASL."

Response

Respondent denies favoring Deaf employees. Respondent reports he "always support[s] complete access to the Deaf and Hard of Hearing." Respondent did not directly answer whether he seeks out input from Deaf employees more frequently, but states, "I'm going to turn the tables, aren't two people who can hear, who have English as their language, aren't they gonna be more connected to people who share their native language than people who don't." Respondent asserts, "I feel like I respect and care for and treat everyone equally. If somebody feels like I'm not doing that, I don't know where that assumption is coming from."

> iii.    ASL preference and attempted mandates

Allegations

Karin Eddy states Respondent told employees during an all-staff meeting in January 2020 that "Our office will be a Deaf ASL office." Eddy explains, "That seemed brazen for an agency advocating for a broad.... continuum" of individuals living with different degrees of hearing loss and/or Deafness. Silvestri also reports Respondent said, "You will use ASL only in the hallways, [and] only use ASL with coworkers." Silvestri reports learning ASL was "difficult" for her, as she lost part of her hearing as a survivor of 2013 Boston Marathon terrorist attack. Silvestri states she "couldn't hold a conversation" in ASL, and instead communicates with "mouthing." Silvestri states the Respondent's perceived mandate of ASL exclusivity "led [her] to not speak in the hallways."

After Respondent "made it clear to communicate in ASL" at the all staff meeting, Ford reports the "staff felt very hurt, and that they had no place at the Commission because of their hearing loss." Ford states Respondent "has no respect" for those with hearing loss. Wilber explains, "If you're sign fluent, [Respondent] has supportive energy."

Johnathan O'Dell states, "I as a person with hearing loss should be able to use what I want" when communicating at the agency, be it ASL, English speech, CART, a combination thereof, or something different. O'Dell reports Respondent "was talking about putting up signs encouraging [employees] to use ASL. O'Dell states he was "offended at that."

Fondo reports Respondent "said he wants everyone to be using ASL during the all-staff meeting in Fall [2019]." Fondo states she is "Deaf and [she has] a cochlear implant:" she states she is "not as fluent" in ASL and is "criticized" by Respondent for her lack of fluency.

Mekuria reports MCDHH policy encourages employees to use ASL and states she does "not see it as a bad thing." However, she reports "you are supposed to be using an interpreter," if one of the parties is not ASL fluent, and states Respondent "created a divide between hearing and Deaf [employees]."  We never had that issue [before the Respondent joined the Commission.]" Mekuria continues, "he was always focused…there is this divide between hearing and Deaf we are not addressing some of the issues he does say in terms of, he would

make you feel like if you don't sign…we never had that divide over the years that I worked here…he did create that issue."

David Del Pizzo reports Respondent "encourages people to engage [in ASL] if they sign not well. He will say, 'Practice your sign!' He wants people to sign [and] practice skills."

<u>Response</u>

Respondent asserts he attempted to put signage up at MCDHH mandating the exclusive use of ASL. Respondent states, "I suggested posted signage at MCDHH, [but] folks [were] not as excited" as he thought they would be. Respondent explains 'The Rhode Island School for the Deaf and the Learning Center have signage that states, 'We use ASL here,'" and reports he was inspired by those institutions to post similar signage at the agency.

Following the investigative interview, Respondent shared several mission and value statements from various Deaf institutions accompanied by the following:

> *Please see a few places where they have a large group of Deaf and Hard of Hearing employees working at the offices like MCDHH that requires to create a safe and friendly space for them to have communication access using their languages which are American Sign Language and English.  I expect everyone is embracing both languages in respect to all Deaf and Hard of Hearing employees.*

# GALLAUDET MISSION AND VISION STATEMENT

## Mission

Gallaudet University, federally chartered in 1864, is a bilingual, diverse, multicultural institution of higher education that ensures the intellectual and professional advancement of deaf and hard of hearing individuals ==through American Sign Language and English==. Gallaudet maintains a proud tradition of research and scholarly activity and prepares its graduates for career opportunities in a highly competitive, technological, and rapidly changing world.

*Approved by the Board of Trustees - November 2007*

## OUR MISSION AND VALUES

The mission of The Learning Center for the Deaf is to ensure that all deaf and hard of hearing children and adults thrive by having the knowledge, opportunity and power to design the future of their choice.

## COMMUNICATION

*We cultivate a diverse bilingual, bicultural community where the primary language of interaction is American Sign Language (ASL).*

# Dual Language Program

**The Horace Mann School for the Deaf and Hard of Hearing is the first public school to have district and state approval as a Dual Language program, qualifying students for the Seal of Biliteracy. Horace Mann School empowers students as Deaf individuals to be lifelong learners and innovative thinkers with diverse linguistic, ethnic, and cultural identities who are fluent in both American Sign Language and English.**

## Mission & Core Values

CCCBSD specializes in meeting the academic and therapeutic needs of children who are deaf, hard of hearing and hearing students who may or may not have unique developmental and/or communication challenges.

CCCBSD is proud to support the unique language needs of our students including: ASL, English, Speech, Assistive Technology and other non-traditional communication systems.

Respondent states he makes efforts to make ASL more approachable to employees who aren't fluent. He reports, "If [an employee] is not fluent in ASL, I will slow down, greet [them] slow and steady." Respondent continues, "If they are struggling, I might ask if they want an interpreter"

Later in the interview, Respondent states the use of ASL at the Commission is "not policy, not a mandate, but encouraged." Respondent continues, "if someone is hearing or Hard of Hearing, [they] should be using sign language." Respondent maintains if "you can sign, you should" at MCDHH.

       iv.    *Only talking to Deaf Employees*

<u>Allegations</u>

Hana Hanigan reports Respondent "would only greet Deaf people," and would "pass by" hearing and hard of hearing employees. Sokol-Shulman reports Respondent "never stuck his

head in [her] office to chat," even though she could "reasonably communicate" in ASL without an interpreter.

Keeter reports Respondent is "dismissive" to employees that are Hard of Hearing, and to employees that are Deaf and speak English. Keeter states Respondent will "stop by certain cubicles and say 'Hi,' chat for a bit. If you're not fluent [in ASL], he won't stop." Lori Novak reports witnessing Respondent "have long conversations with others," but is "not often talking" to her, a hearing person who is not fluent in ASL. Novak reports the extent of communication from the Respondent is "hello," in "passing." Eddy states the "only people he talks to are people who Deaf and ASL users." Eddy also reports Respondent established a "luncheon group" comprised of "Deaf staff only."

Further, Hanigan reports there is a "hierarchy of people [Respondent] would listen to on the statewide Advisory Council," and states "hearing parents" were at the "bottom."[15]

Additionally, several employees report Respondent shifts his attitude and demeanor towards Deaf employees who use ASL when he finds out they can also speak English. Eddy reports she, a person fluent in sign, chose to speak in a presentation as she "didn't feel comfortable signing." After the meeting, Eddy reports Respondent asked her "how do you identify," as he previously did not know Eddy spoke English. Eddy states her working relationship with the Respondent "shifted" negatively after he learned she could speak and sometimes used spoken English. Ford states Respondent's "attitude changed with [Mitchell] once he found out she could speak." Similarly, Ford asserts Respondent "treated [Eddy] differently when he learned she could speak."

Response

When asked whether he preferred communicating with Deaf employees, Respondent stated the following:

> *"Well let me turn it around, let me try to explain in a different way. If there a couple of hearing people who are speaking English in the hallway, how would I have access to what they're saying? Do I have to be responsible that I'm included in their conversation? Who's responsible there to make sure people are included? Everyone is responsible."*

Respondent reports, "There is some natural flow between people who speak similar versus unlike languages." Respondent also states he "want[s] rapport with everyone in the agency," and assert he goes "out of [his] way to do that. Respondent continues, "I've never said 'I want to have this conversation with this person because we communicate well.' That is not me, I'm very social…. If [someone who was not fluent in ASL] wanted to be included in the conversation, I would include them in the conversation."

---

[15] The Statewide Advisory Council includes, amongst others, hearing parents of Deaf children. Because Council members are not Commonwealth employees, this allegation is outside the scope of this investigation.

### c) Communication access issues

  *i. Dismissing interpreters at events and inconsistent interpreter requests*

<u>Allegations</u>

  Terry Malcolm alleges Respondent improperly recalled deaf interpreters from interpreting at a Community event. Malcolm explains that, in events held in the community, a team of Certified Deaf Interpreters would accompany Respondent to both "mirror" questions from the audience, and to interpret Respondent's style of sign into a more accessible format for the specific audience. At this event, Malcolm states Respondent dismissed her and "signed for himself" directly to the audience. Malcom explains, "we know this community, it would've worked best if both of us signed. His sign was very educated, [and] who we serve is grassroots and may not understand" Respondent's style. During the event. Malcolm reports "a few Deaf consumers asked us, 'What's he saying?" and states they "motion [ed]" for her to join the Respondent in signing. Malcolm reports the Respondent instructed her to "just sit" while he continued to sign solo. Malcolm asserts, "He might not understand the use of Deaf interpreters. Maybe he needs more training."

  Additionally, Hana Hanigan alleges Respondent "dismissed" the interpreter scheduled to interpret during the last June 22, 2020 meeting between him and MCDHH interpreters. Hanigan reports she was not on that call, as she had "reached [her] limit of 'apology sessions'" that day.[16]

  Hanigan reports Respondent does not schedule interpreters for conversations with her, though she states she is not "fluent" in ASL, only "proficient." Meanwhile, Hanigan reports Respondent schedules interpreters for his meetings with Tricia Ford, who is a certified interpreter. Hanigan states this choice is "odd, insulting, and weird."

  Silvestri reports Respondent was "intimidating" when approaching her in the office prior to the pandemic, as he would "approach [her] without an interpreter and try to have conversations." Silvestri reports Respondent "was getting a thrill after seeing [her] like a deer in headlights," as she could not comfortably communicate in ASL.

  Ford reports Respondent has characterized interpreters as a "waste of resources" in the past.

<u>Response</u>

  Respondent denies recalling interpreters from an event and states he "can't think of when that would be." Respondent he states, "I support Deaf Interpreters," and asserts, "I would never shunt aside Deaf interpreter" "

  Respondent also denies interfering with communication access, stating he "always met everyone's communication access" needs. Respondent reports he is a "huge advocate for clarity of speech" and is "unclear if [there was] a misunderstanding" at an event. Respondent states, "If someone felt differently, I would like to know"

  Respondent states he would "never" refuse an employee's request for an interpreter. He

---

[16] As Respondent's Executive Assistant, Hanigan attended all of the June 22 Zoom calls, save the final one.

points to his "own needs" of interpreter usage with employees who do not use ASL as an example of why he would not deny any employee communication access. Respondent characterizes himself as "flexible around communication needs." When asked how he would communicate with an employee who is not fluent in ASL, Respondent states he would "chat in the moment, if [the topic was] critical [he] might call [an] interpreter, ask [the] person if they mind waiting" for an interpreter to arrive to continue the conversation.

> ii.    No CART during meetings

Allegations

Silvestri reports there was no CART on the June 22, 2020 meeting she attended. On another occasion, Hostovsky reports Respondent "stopped" a Hard of Hearing employee who "does not sign well, uses CART" from "signing [the word] 'Interpreter'" when the Respondent was communicating with her.

Response

Respondent reports he has no influence on the presence or absence of CART at any given meeting. Respondent states, "Any CART or interpreter request goes in through the system, there is no need for approval." Respondent reports there is no "need for interpreter/CART is automatic since in house. [The request is] automatically honored."

Similarly, his interpreter Christine West reports there is communication access at "every meeting." West explains, "if there is no access [the meeting is] cancelled."

## IV.    **Findings of Fact**

### 1)   **Allegations of Sexual Harassment**

In Massachusetts, "Sexual Harassment" means sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when:

> A. Submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; or
> B. Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Here, the Respondent's conduct does not rise to the level of Sexual Harassment. Respondent plausibly asserted that any comment he may have made about an interpreter's lips would have been appropriate in the context of discussing signing and expression through a clear mask, as the lips are regularly used in ASL communication.

While it remains inconclusive whether Respondent touched Hostovsky's finger on the map in his office, the act of touching her finger alone would not rise to the level of sexual harassment. A one-off touch of one's finger to an employee's finger, while pointing at a map, would not unreasonably interfere with an employee's work performance and would not, alone,

create an intimidating, hostile, humiliating, or sexually offensive work environment.

Though the investigation was initiated based on the existence of allegations of Sexual Harassment, no additional allegations were reported to the undersigned. The COE attempted to identify and investigate the alleged Sexual Harassment conduct that was discussed in the union meetings, but no employees shared additional allegations in the investigation.

### 2) <u>Allegations of Discrimination</u>

Discrimination is the unfair treatment because of an individual's membership in a particular group or treating an individual differently from others similarly situated with the respect to the terms, conditions or privileges of employment because he or she is a member of a class protected by law. It may involve, but is not limited to: harassment, by creating, or allowing to exist, an environment hostile to an individual's membership in a protected class, failing to provide an individual a reasonable accommodation to an individual's disability, or pursuing a practice or policy, which, while it appears neutral on its face, has a disproportionate impact on individuals who are members of a protected class.

#### *Discrimination on the basis of Religion*

Here, the Respondent's conduct prior to Rosh Hashanah in 2019 does not rise to the level of discrimination on the basis of religion. Although Respondent states he does not recall asking Sokol-Shulman to consider work matters during the Jewish Holiday, his comments would not, alone, arise to the level of a policy violation. While insensitive, asking an employee to consider work while out of the office observing a religious holiday one time is neither severe nor pervasive. Sokol-Shulman asserts Respondent apologized after she informed him she would be observing the holiday, and reports he made no other comments outside of the June 22, 2020 call that are not subject to this investigation.

#### *Discrimination on the basis of Race*

Here, the Respondent's conduct towards MCDHH employees of color rises to the level of a policy violation. The frequency of which interviewed employees reported discriminatory conduct on the basis of race speaks to the pervasiveness of Respondent's problematic conduct. Consistent and credible examples include inappropriate questioning of Black employees' experiences regarding Diversity, the unnecessary use of racial qualifiers when describing individuals, and the lack of response when employees actively told Respondent his comments and conduct were inappropriate. The discriminatory impact of Respondent's conduct was so pervasive that a Black employee, Janay Mitchell, "goes blank" any time she has to interact with him, and "suppresses" her concerns in order to keep going.

Respondent's discriminatory conduct stems from a lack of self-awareness and an ignorance surrounding issues of race, diversity, and inclusion, which even continued into the Respondent's investigative interview. Despite being informed of the myriad examples employees at the Commission shared about his attitude towards race, Respondent maintained his efforts were "good enough" regarding Diversity and Inclusions, and stated his only regret was not "grab[bing]" the opportunity to spotlight Stephanie Hakulin and "be more encouraging."

According to him, Respondent made many attempts to discuss race, diversity, and inclusion, but never implemented any tangible actions, save for his attempt to convene an affinity

group whose members rejected the idea. Additionally, his attempts at further discussion were ill-informed at best, and most likely negligent as asking multiple employees on multiple occasions, unsolicited questions about their experience as a person of color created an environment where those employees felt uncomfortable, marginalized and stigmatized as employees.. Respondent's belief, which persisted through the investigative process, that it is permissible to unilaterally assemble a group based on a perceived racial or ethnic group without buy-in or permission from the individuals in that group resulted in a hostile work environment. .

Further, Respondent's continued lack of sensitivity surrounding employees' membership in protected classes and the appropriate time to discuss and/or consider them is additional evidence of discriminatory conduct. Respondent sent the following email to the undersigned after the interview to elaborate on his response to the question, "Did you ever use the phrase "there are too many hearing white women:"

*I told them that from a public perception (the interpreter community), they may view this process to be lacking diversity because Janice and Denise are white, hearing, and women. I encourage that the team should be made up of all diverse individuals who are expertise in the field of interpreting including People of color, Deaf, and men.*

Respondent's pervasive lack of reflection when speaking to and about employees in a protected class based on their race is discriminatory. Respondent uses inappropriate phrasing in defense of his inappropriate comments and conduct. His continued, consistent disregard for norms of respectful behavior contribute to a hostile work environment for employees of color.

Respondent's credibility is called into question as his responses to questions about his role, the role of prior Commissioners, and the role of the Commission as an entity differ materially on regarding matters related to race. On the one hand, Respondent alleges he inherited issues regarding race when he joined the Commission and centered his denial of engaging in discriminatory conduct on the problems as holdovers from previous administrations. However, Respondent also asserted it was "news to [him]" in November 2019 that "the Commission is well known for not talking to marginalized groups" after meeting with a group of interpreters of color. Respondent simultaneously characterized race-based discrimination as an inherited problem from previous administrations and as something he was unaware of until November 2019, a contradiction which calls his credibility into question and attempts to absolve him from any culpability at any point during his tenure as Commissioner.

Respondent acknowledges the November 2019 Cornel West interpreting assignment was problematic yet takes no responsibility for the assignment even though he made the decision. He begins, "Cornel West [contacted him] for an interpreter referral," and reports he "was able to finally get Denise Martinez who was willing to interpret his event." In his next sentence, Respondent states, "Afterwards, there were interpreters of color who were very, very upset because they weren't contacted, and there were a few who were available who were not contacted." Respondent takes no responsibility, though he admittedly made the referral, and talks about the interpreters being frustrated in a passive voice rather than actively discussing his role.

Finally, while the emails show the Respondent was not solely responsible for the new dress code policy, his judgement of Janay Mitchell's shirt with a Puma logo on October 25, 2019 clearly prompted him to request a dress code be drafted and enacted. The most notable difference between the August 2019 draft policy and the final policy is the addition of the guidelines around logos. The draft did not mention logos, reading in part, "Clothing should be

free of pictures or words that are offensive, profane, explicit, or relate to alcohol, tobacco or illegal substances, politics, or personal views."

### *Discrimination on the basis of Gender*

Here, the Respondent's conduct towards female MCDHH employees rises to the level of a policy violation. The interviewed employees presented consistently and credibly while alleging Respondent engaged in broad-scale and pervasive disparate treatment of women. Themes of arrogance, dismissiveness, and disrespect towards women recurred throughout the interviews. For example, the Respondent failed to include the female Deputy Commissioner and Chief Finance Officer in a statewide budget meeting and assigned only men to produce the vlogs.  In addition, Respondent sought out the sole black male MCDHH employee to work on the Black History Month newsletter project, despite there being four weeks' worth of newsletters and four black women staff, with longer tenure at MCDHH, who were not tapped for the project. Respondent had no real response to this allegation, and generally presented as flippant and unconcerned about the perception, and the credible assertions, that women are not treated equally at the agency.

### *Discrimination on the basis of disability*

Here, the Respondent's conduct towards Hard of Hearing MCDHH employees and Deaf MCDHH employees who speak rises to the level of a policy violation.

The interviewed employees who reported witnessing and/or experiencing discrimination on the basis of disability presented consistently, credibly, and corroborate each other's accounts. Across departments, work locations, and genders, interviewed employees characterized Respondent as favoring Deaf individuals who use ASL exclusively over Hard of Hearing employees and Deaf employees who speak English. Respondent's conduct, as credibly described by the interviewed employees, contributed to a hostile work environment for certain MCDHH employees with disabilities.

Respondent's lack of judgment manifests as discriminatory conduct towards Deaf employees who speak English and Hard of Hearing employees. Respondent has made several problematic decisions regarding the use of interpreters at events and equal communication access. These decisions are concerning for anyone, but are especially problematic given that Respondent is the Commissioner for an agency tasked with ensuring equal access to the spectrum of communication needs of the employees and clients they serve.

In addition to the creation of a hostile work environment, Respondent disproportionately impacted the ability of certain employees with disabilities to work.  Respondent discriminated against MCDHH with disabilities who do not exclusively use ASL by stating MCDHH employees must exclusively use ASL, and suggesting signage reinforcing his belief. The lack of awareness of the widescale discriminatory impact an ASL-exclusive mandate would have on MCDHH employees with disabilities. Employees who are Deaf or Hard of Hearing have a spectrum of communication that sometimes does not include the use of ASL. In attempting to mandate the exclusive use of ASL, the Respondent would have effectively removed communication access for several MCDHH employees with disabilities.

Though his attempted mandate for ASL exclusivity and accompanying signage were not enacted, his statements during the all staff meeting had a chilling effect on MCDHH employees

with disabilities. Employees with disabilities who cannot communicate or choose not to communicate in ASL credibly reported being stifled from communicating in the office, due to Respondent's conduct. Respondent discriminated against MCDHH with disabilities who do not exclusively use ASL by stating MCDHH employees must exclusively use ASL, and suggesting signage reinforcing the mandate.

Respondent offered the mission statements of other Deaf institutions as evidence that his desire for ASL to be the exclusive method of communication is not problematic. However, all of the statements emailed to the undersigned champion the use of both ASL and English, in a bilingual environment, not exclusive ASL use as suggested by Respondent.

Additionally, in the interview with the undersigned, Respondent twice stated he would "turn" the investigative questions regarding his alleged preference for Deaf "around," to hypothetically ask the undersigned whether hearing people would prioritize communication with other hearing employees. Respondent's stated thought process demonstrates a lack of awareness that his behavior is problematic. Respondent's attempted justifications by "turning the tables" to the undersigned demonstrate Respondent's propensity to categorize and group people by protected characteristic, and not as employees in a shared work environment.  Respondent took no responsibility for treating Hard of Hearing and Deaf employees who speak differently, and instead made problematic assumptions about what others would do when faced with a similar choice.

Finally, Respondent asserts he is the first "100% Deaf" Commissioner at the agency. Though he is the first Commissioner who uses ASL exclusively, the two previous Commissioners identify as Deaf: Heidi Reed is Hard of Hearing and identifies as Deaf, and BJ Wood is Deaf and identifies as Deaf.[17] That Respondent does not consider the former Commissioners as "100% Deaf" is indicative of his mindset, one that bases the validity of one's Deafness based on their choice and/or ability to speak English in addition to ASL.

## V.   <u>Conclusion</u>

Here, there is a widescale pattern of discriminatory harassment and discriminatory behavior by Respondent to MCDHH employees on the basis of race, gender, and disability. Regardless of Respondent's stated intent, his conduct has severely affected MCDHH employees and created a hostile work environment. Respondent's policy violations had a chilling effect on MCDHH employees to participate and engage with him and the agency, as they were credibly made to feel unwelcome and unvalued by Respondent through his actions and proposed initiatives. The discriminatory impact of Respondent's comments created an atmosphere of intolerance, in which those who were not White and Deaf were treated differently.

Respondent's own ignorance regarding the effect of his statements and actions is troubling: even upon reflection, Respondent did not admit to any wrongdoing, save for his "regret" for not pushing his questionable ideas for diversity further.  Respondent writes about minorities with qualifiers (i.e. "POC Interpreter" and "POC person (or she prefers to be called differently such as African American, Black, etc.)")  and offered those as evidence of his attempts at inclusion. That Respondent would write these qualifiers in emails, then offer them to the undersigned as evidence of his inclusivity, speaks to Respondent's deep-rooted bias. There is

---

[17] According to each former Commissioner's consumer profile maintained by MCDHH for interpreting and community services.

no need to qualify an individual by their protected characteristic if it is not immediately and indelibly linked to the conversation at hand.

Respondent's assertions that he champions Diversity and Inclusion, and the provided email evidence he emphasizes demonstrates his intent, do not absolve his discriminatory behavior. Respondent does not take any responsibility for the pattern of discriminatory behavior, and instead blames the Commission as an entity separate from himself whose issues surrounding race, diversity, and inclusion were inherited from past administrations.

The advancement of Deaf employees and Deaf culture is not problematic in and of itself, but becomes discriminatory when it comes at the expense of employees in other protected classes.

Signature of Primary Investigator                                  Date: 9/29/20


NOTE: THE INVESTIGATIONS CENTER OF EXPERTISE INVESTIGATES COMPLAINTS BETWEEN EMPLOYEES OF ALLEGED VIOLATIONS OF COMMONWEALTH POLICIES PROHIBITING DISCRIMINATION, SEXUAL HARASSMENT, DOMESTIC VIOLENCE/SEXUAL ASSAULT/STALKING, WORKPLACE VIOLENCE, AND RETALIATION RELATED TO THOSE POLICIES.   ALL FINDINGS AND CONCLUSIONS CONTAINED IN THIS REPORT ARE BASED ON COMMONWEALTH POLICIES AND ARE NOT INTENDED TO BE CONSTRUED OR RELIED UPON TO BE A VIOLATION OF ANY STATE OR FEDERAL LAW OR REGULATION.