UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
STEVEN A. FLORIO,                             )
                                              )
              Plaintiff,                       )
      v.                                       )
                                              )
COMMONWEALTH OF MASSACHUSETTS,                )
GOVERNOR CHARLES E. BAKER, individually       )
and in his official capacity, MARYLOU         )
SUDDERS, individually and in her capacity as  )      Civil Action No. 1:21-CV-10665-IT
Secretary of Health and Human Services,       )
CATHERINE STARR, individually and in her      )
capacity as Secretariat Human Resources Officer )
and ERICA CRYSTAL, individually and in her    )
capacity as Executive Office of Health and Human )
Services Labor Relations Director and Deputy  )
General Counsel for the Commonwealth of       )
Massachusetts,                                )
                                              )
              Defendants.                      )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Philip N. Beauregard, BBO # 034780          Carlin Phillips, BBO # 561916
Law Offices of Beauregard, Burke and Franco  Phillips and Garcia, P.C.
32 William Street                            13 Ventura Drive
New Bedford, Ma 02740                         Dartmouth, Ma 02747
Tel. No. (508) 993-0333                       Tel. No. (508) 998-0800
pbeauregard@bbflawoffices.com                 cphillips@phillipsgarcia.com

Dated: September 14, 2021

**TABLE OF CONTENTS**

INTRODUCTION .............................................................................................................. 1

RELEVANT FACTS ......................................................................................................... 1

ARGUMENT .................................................................................................................... 6

I.  THE ELEVENTH AMENDMENT DOES NOT PRECLUDE THE FEDERAL COURT
    FROM EXERCISING JURISDICTION OVER CLAIMS BROUGHT UNDER
    DEFENDANTS' INDIVIDUALLY 42 U.S.C. § 1983 ..................................................... 7

II. THE ELEVENTH AMENDMENT DOES NOT PRECLUDE THE FEDERAL COURT
    FROM EXERCISING JURISDICTION OVER CLAIMS FOR PROSPECTIVE
    INJUNCTIVE RELIEF FOR VIOLATIONS OF FEDERAL LAW ................................... 7

    A.  The Plaintiff's Claims for Prospective Injunctive Relief Are Not Subject to
        Eleventh Amendment Immunity .................................................................... 8

    B.  The Plaintiff Has Alleged Sufficient Facts to Support His Due Process Liberty
        Interest Claim ............................................................................................... 9

        1.  Coupled with the July 8 Suspension and the October 19, 2020
            Termination, Alleged Defamatory Statements Have Substantially
            Damaged the Employee's Standing and Association in the Community . 11

        2.  The Plaintiff Disputed the Statements as False ......................................... 13

        3.  The Statements Were Intentionally Disseminated/Publicized by the
            Defendants ............................................................................................... 13

        4.  The Plaintiff Suffered an Injurious and Tangible Alteration of His
            Employment Status In Addition to  the devastating Injury to His
            Reputation ............................................................................................... 16

        5.  The Plaintiff Demanded a Post-Termination Hearing in Writing Which
            Was Denied by the Defendants ................................................................. 18

        6.  Qualified Immunity Does Not Apply to a Claim for Prospective Injunctive
            Relief ........................................................................................................ 18

    C.  The Individual Defendants Are Not Insulated from Liability by Qualified
        Immunity ...................................................................................................... 18

III. PLAINTIFF HAS ALLEGED A VIOLATION OF THE FIRST AMENDMENT'S
     RIGHT TO FREEDOM OF ASSOCIATION ................................................................. 19

A.    The Plaintiff Has Plead Sufficient Facts to Support a First Amendment Right in an Intimate Association with Kappa Gamma and Its Members .......................... 22

B.    The Plaintiff Has Plead Sufficient Facts to Support a First Amendment Expressive Association Claim ................................................................................................ 23

C.    The Plaintiff's First Amendment Freedom of Association Rights Were Clearly Established ............................................................................................................. 24

D.    The Governor Is a Proper Defendant with Respect to the Plaintiffs Due Process Claim for a Name-Clearing Hearing .................................................................... 26

CONCLUSION ...................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*A.M. v. N.M. Dep't of Health*, 117 F. Supp. 3d 122 (D.N.M. 2015) ............................................ 25

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ............................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................... 6

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ............................................................ 21, 23

*Brennan v. Hendrigan*, 888 F.2d 189 (1st Cir. 1989) ...................................................... 10, 12, 16

*Buntin v. City of Bos.*, 813 F.3d 401 (1st Cir. 2015) ............................................................... 10, 11

*Burton v. Town of Littleton*, 426 F.3d 9 (1st Cir. 2005) ............................................................... 13

*Caisse v. DuBois*, 346 F. 3d 213 (1st Cir. 2003) ........................................................................... 8

*Carey v. Mount Desert Island Hosp.*, 910 F. Supp. 7 (D. Me. 1995) .......................................... 15

*Codd v. Velger,* 429 U.S. 624, (1977) ................................................................................... 10, 12

*Cortes-Reyes v. Salas-Quintana*, 608 F.3d 41 (1st Cir. 2010) ..................................................... 24

*Costa-Urena v. Segarra*, 590 F.3d 18 (1st Cir. 2009) ................................................................... 9

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................................................... 8

*Fajana v. Vance*, No. 15-13727-RWZ, 2016 U.S. Dist. LEXIS 199293 (D. Mass. July 6, 2016)
............................................................................................................................................. 10, 13

*Green v. Mansour*, 474 U.S. 64 (1985) .......................................................................................... 9

*Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009) ...................................................................... 8

*Gunasekera v. Irwin*, 678 F. Supp. 2d 653 (S.D. Ohio 2010) ...................................................... 9

*Hafer v. Melo*, 502 U.S. 21 (1991) ............................................................................................... 7

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................. 26

*Hayes v. Sweeney*, 961 F. Supp. 467 (W.D.N.Y. 1997) .............................................................. 14

*Healy v. James*, 408 U.S. 169, 92 S. Ct. 2338, 2348 (1972) ...................................................... 21

*Hewitt v. Helms*, 459 U.S. 460 (1983) .......................................................................................... 9

*Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1 (1st Cir. 2015) ............................................................ 7

*Jordan v. Carter*, 428 F.3d 67 (1st Cir. 2005) ............................................................................ 24

*Landsberg v. Me. Coast Reg'l Health Facilities*, No. 08-CV-59-B-W, 2009 U.S. Dist. LEXIS
37390 (D. Me. Apr. 10, 2009) ............................................................................................. 14, 15

*Langadinos v. American Airlines, Inc.*, 199 F.3d 68 (1st Cir. 2000) ............................................ 6

*Laureano-Agosto v. Garcia-Caraballo*, 731 F.2d 101 (1st Cir. 1984) ....................................... 16

*Lugo v. Alvarado*, 819 F.2d 5 (1st Cir. 1987) ........................................................................ 18, 26

*Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009) ............................................................... 19

*Maraj v. Massachusetts*, 836 F. Supp. 2d 17 (D. Mass. 2011) ..................................................... 7

*Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995) .......................................................................... 24

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................................................. 10

*Mendoza v. SSC&B Lintas*, 799 F. Supp. 1502 (S.D.N.Y. 1992) ................................................ 14

*Mills v. Maine*, 118 F.3d 37 (1st Cir. 1997) .................................................................................. 9

*NAACP v. Alabama*, 357 U.S. 449 (1958) ................................................................................... 21

*Ortega-Rosario v. Alvarado-Ortiz*, 917 F.2d 71 (1st Cir. 1990) ............................................... 10

*Paul v. Davis*, 424 U.S. 693 (1976) ............................................................................................ 16

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................................. 18

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435 (3d Cir. 2000) ............... 22

*Redondo—Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1 (1st Cir. 2005) ................... 7

*Rivera De Leon v. Maxon Eng'g Servs.*, 283 F. Supp. 2d 550 (D.P.R. 2003) .............................. 6

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................................ 21

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984)........................................................ 21, 22
*Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230 (1st Cir. 2002)............................................ 8
*Silva v. Worden*, 130 F.3d 26 (1st Cir. 1997) ...................................................................... 16
*Town of Barnstable v. O'Connor*, 786 F.3d 130 (1st Cir. 2015).......................................... 7
*Tubbesing v. Arnold*, 742 F.2d 401 (8th Cir. 1984)............................................................ 18
*United States v. Robel*, 389 U.S. 258 (1967) ...................................................................... 21
*URI Student Senate v. Town of Narragansett*, 631 F.3d 1 (1st Cir. 2011) ..................... 19, 21, 22
*Valentin v. Hosp. Bella Vista*, 254 F.3d 358 (1st Cir. 2001) .............................................. 6
*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) .................................................................... 7
*White v. Blue Cross & Blue Shield of Mass.*, 442 Mass. 64 (2004)...................................... 14
*Wilkinson v. Austin*, 545 U.S. 209 (2005)............................................................................ 9
*Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36 (1st Cir. 2005) ...................... 21
*Wojcik v. Mass. State Lottery Comm'n.*, 300 F.3d 92 (1st Cir. 2002) .................................. 11

**Statutes**

42 U.S.C. § 1983.................................................................................................................... 12, 23

**Constitutional Provisions**

U.S. Const. Amend. XIV, § 1 ................................................................................................ 14

## INTRODUCTION

The defendants move to dismiss all seven claims contained in the Plaintiff's First Amended Complaint ("FAC"). The defendants challenge the Court's jurisdiction under the Eleventh Amendment, while also moving to dismiss the plaintiff's claims under Rule 12(b)(6) for failing to state a claim upon which relief can be granted. The parties filed a Notice pursuant to LR 7.1 and a proposed order (which the Court entered), regarding their agreement to dismissal of the plaintiff's state law based claims (Counts 1, 2, 3, 4, and 7) without prejudice and their dismissal of the monetary damage claims against the individual defendants in their official capacities with respect to Counts 5 and 6. Accordingly, the plaintiff's 42 U.S.C.§ 1983 claims (Counts 5 and 6) are the only claims to be decided by the Court in response to the defendants' Motion to Dismiss. The plaintiff offers the below argument in opposition to dismissal of his federal civil rights claims.

## RELEVANT FACTS

Plaintiff Steven A. Florio is a profoundly deaf white person, he is 51 years old. His wife and three male children are also profoundly deaf. In February of 2019, Steven A. Florio was appointed by Governor Charles E. Baker as Commissioner of the Massachusetts Commission for the Deaf and Hard-of-Hearing ("MCDHH"). He served as Commissioner from February 19, 2019, until his termination on October 19, 2020. FAC ¶ 31. Prior to becoming the Commissioner of MCDHH, the plaintiff had served successfully as the Executive Director of the Rhode Island Commission of the Deaf and Hard of Hearing ("RICDHH") for 16 years. FAC ¶ 33. At all times during his eighteen months as Commissioner of MCDHH, plaintiff performed his duties in an exemplary manner, consistent with his prior 16 years of experience as Executive Director for

RICDHH. FAC ¶ 48. At no point in time until the events in the FAC had the plaintiff been the subject of any complaint against him by his staff or superiors for any reason. FAC ¶ 49.

Plaintiff is a 1992 graduate of Gallaudet University, a university in Washington, D.C. for the deaf and hard of hearing. FAC ¶ 41. For one year while at Gallaudet -- April 1991 through Spring 1992 -- plaintiff was a member of Kappa Gamma FAC ¶ 43, a fraternity that has historically served as a significant network for professionals and others who advocate nationally and internationally on issues that affect the deaf and hard of hearing FAC ¶ 44.

On June 5, 2020, a false accusation was made against plaintiff in a Facebook post by a controversial deaf community blogger that plaintiff had appeared in a Gallaudet University 1990 yearbook group photo of Kappa Gamma engaged in the Bellamy Salute, which the blogger referred to as a Nazi salute. FAC ¶¶ 50, 51. These defamatory allegations were read online by the Deputy Legal Counsel for the Massachusetts Commission for the Deaf and Hard of Hearing and the Massachusetts Rehabilitation Commission. The Deputy Counsel reported the false allegations to Legal Counsel, his boss. In turn, the false allegations were also reported to Secretariat Legal Counsel for the Executive Office of Health and Human Services. FAC ¶ 52.

Based on these false allegations, in early June of 2020, the defendants investigated plaintiff, asking whether he was in the photograph and whether he was a member of the Kappa Gamma fraternity. At that point, no allegations had ever been made against plaintiff regarding his conduct in the workplace. FAC ¶ 53. Plaintiff spent the next two weeks providing evidence to defendants that he was not in the photograph. Nevertheless, defendants Sudders, Starr and Crystal instructed plaintiff to draft a "disavowal" statement for their review disassociating himself from Kappa Gamma. FAC ¶ 54; Exhibit A, Pl's Aff, p. 1, ¶1, p. 3.

Pressured by defendants, plaintiff initially drafted a short eleven-line statement. Exhibit A, p. 3. Defendants then edited, re-wrote, and expanded plaintiff's short statement by adding significant new language, with versions of the statement (an "Employee Message," and a "Stakeholder Message") for the separate audiences to which the plaintiff was required to make the statement. By the time defendants finished drafting the statements, they were significantly different from the original, short message drafted by plaintiff. Exhibit A, p. 1, ¶2, pp. 3-9.  Of particular note, in addition to making plaintiff disavow his affiliation with Kappa Gamma and profess guilt by apologizing, defendants added the following language to be read[1] by the plaintiff: "I understand that due to *my own privilege*, I could not see the damage done by this organization and its misguided traditions." Exhibit A, pp. 4-5, 6, 7, 8.

Plaintiff was concerned about both the tone and content of the mandated statements as they were cold and portrayed him in a false light. FAC ¶ 56. He specifically complained about the use of the term "privilege." Exhibit A, p. 1, ¶4.  Defendants would not remove the word "privilege" despite the plaintiff's protests. Exhibit A, p. 1, ¶4, pp. 4-5, 6, 7, 8.

Defendants then outlined specific plans which they instructed plaintiff to follow when communicating the statements verbatim to MCDHH employees and "external stakeholders" associated with the Commission. Exhibit A, p. 1, ¶ 3;  FAC ¶ 55. Plaintiff, feeling coerced and pressured by the defendants and in fear of losing his job, agreed to submit to their direction and as a result held several meetings between June 22 and June 30, addressing both his direct and indirect reports within the office of Commissioner and external stakeholders. Exhibit A; FAC ¶ 57.

---

[1]  The "readings" by plaintiff were in American Sign Language (ASL).

The required meetings, and the plaintiff's reading of defendants' required statements during the meetings, directly led to the local union's (Service Employees International Union, Local 509, AFL-CIO) June 29, 2020 defamatory letter to Defendant Governor Baker, falsely stating that plaintiff "admitted to dressing as a Nazi and saluting while wearing garb resembling the uniforms of the Ku Klux Klan during his time as a fraternity brother of Kappa Gamma at Gallaudet University."  As a further result, a vote of "no confidence" in the Commissioner was arranged by the Union. FAC ¶ 58. The Union's letter to Governor Baker also referenced the June 22nd meetings and stated: "The Commissioner's blasé attitude and dismissive response left much to be desired."  FAC ¶ 59.

Defendants never informed the Union or its members that they had authored the statement that defendant was required to read on June 22, and to send out in written form, nor that they disallowed him to deviate from the script they had written. FAC ¶ 60. On July 7, 2020, the Boston Globe published an article quoting the Union's June 29, 2020 letter to Governor Baker, further defaming plaintiff and damaging his reputation. FAC ¶ 61. Plaintiff had not made the statements appearing in the Globe or the Union's letter. In a July 8, 2020 press conference Governor Baker was asked about the Kappa Gamma allegations against plaintiff and he responded there would be an investigation. FAC ¶ 62. The very next day, on July 9, 2020, the plaintiff was placed on administrative leave without any explanation or statement of reasons by defendants. Exhibit B (Suspension Letter).  It was only later, when he was finally terminated on October 19, that he was told that there had allegedly been an anonymous complaint of sexual harassment, which accusation was eventually found to lack merit.

At or around the time of his suspension, on July 9, 2020, the defendants initiated their efforts soliciting plaintiff's staff to make complaints about the plaintiff. In total, defendants

conducted three additional investigations of plaintiff's conduct in the workplace after he was falsely accused of being depicted in the online picture of Kappa Gamma members. FAC ¶ 72. Prior to the Commonwealth's investigation and solicitation of complaints, plaintiff had never had a staff complaint against him in his 17 plus years of combined work as the Commissioner in Rhode Island and Massachusetts. FAC ¶ 73. Plaintiff was sent home involuntarily on July 9, 2020, without being given any statement of reasons. Two and a half months later on October 19, 2020, defendants terminated plaintiff for having created an alleged hostile work environment. Defendants expressly omitted any mention of plaintiff's association with Kappa Gamma as a reason for his termination. Exhibit C (Termination Letter).

 Plaintiff was denied any meaningful opportunity to defend himself during the State's subsequent investigations of him, and after his termination as well. Prior to defendants' filing their Motion to Dismiss, which attaches the unredacted Justine Plaut investigative report, plaintiff was not provided with the names of the alleged complainants. FAC ¶ 74. Plaintiff still has not been provided with any of the back-up or supporting documentation for any of the alleged complaints against him or the supposed "findings" made against him.

Plaintiff has had no pre-termination or post-termination process of any kind, despite requesting to be represented by counsel pre-termination and for a name clearing hearing post-termination. FAC ¶ 75. The stigma attending both his suspension and termination by the Commonwealth has permanently and effectively banned plaintiff from working as an executive in the deaf and hard-of hearing community and irreparably scarred his personal and professional reputations.  Plaintiff has sought executive level jobs but has not been able to obtain even an interview. FAC ¶ 76.

## ARGUMENT

In considering a motion to dismiss under 12(b)(6), the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor. See *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). A claim that does not plead "enough facts to state a claim to relief that is plausible on its face" will be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Challenges to subject matter jurisdiction through a Rule 12(b)(1) motion to dismiss come in two different forms: sufficiency challenges and factual challenges. *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). Under a sufficiency challenge, the Court accepts plaintiff's version of jurisdictionally significant facts as true and addresses their sufficiency, thus requiring the court to assess whether the plaintiff has propounded an adequate basis for subject matter jurisdiction. *Id.* In making said determination, the court "must credit the plaintiff's well-pleaded factual allegations . . ., draw all reasonable inferences from them in [the plaintiff's] favor, and dispose of the challenge accordingly." *Id.*; *See Rivera De Leon v. Maxon Eng'g Servs.*, 283 F. Supp. 2d 550, 554 (D.P.R. 2003). The defendants appear to argue on both fronts. Accordingly, the Court has "broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearing in order to determine its own jurisdiction." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001)(citations omitted).

Moreover, as part of its Rule 12(b)(6) analysis, without converting a motion to dismiss into a motion for summary judgment, the Court can consider documents, the authenticity of which are not disputed by the parties, official public records, documents central to the plaintiff's complaint, or documents sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1,

3-4 (1st Cir. 1993)(allowance of plaintiffs introduction of documents in order to bolster their argument against defendant's Motion to Dismiss).

I.    **The Eleventh Amendment Does Not Preclude the Federal Court from Exercising Jurisdiction Over Claims Brought Against Defendants' Individually Pursuant to 42 U.S.C. § 1983**

While the Eleventh Amendment completely shields the Commonwealth and partially shields the defendants in their official capacities from suit in federal court, the plaintiff's section 1983 claims against the individual defendants are not subject to Eleventh Amendment immunity. "Section 1983 creates a private cause of action against a person who, under color of state law, deprives another of rights secured by the Constitution or federal law." *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (quoting *Redondo—Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005). State officials sued in their individual capacities are "persons" within the meaning of § 1983 and are not immune from suit. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). This right is tempered "by the operation of the doctrine of qualified immunity, which 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights . . .'". *Maraj v. Massachusetts*, 836 F. Supp. 2d 17, 26 (D. Mass. 2011)( quoting 42 U.S.C. § 1983).

II.   **The Eleventh Amendment Does Not Preclude the Federal Court from Exercising Jurisdiction Over Claims for Prospective Injunctive Relief for Violations of Federal Law**

It is a long-established exception to Eleventh Amendment immunity that a plaintiff is entitled to seek prospective injunctive relief against individual defendants in their official capacities. *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138-39 (1st Cir. 2015); *Caisse v. DuBois*, 346 F. 3d 213, 218 (1st Cir. 2003). Pursuant to *Ex parte Young*, 209 U.S. 123, 159-60 (1908), federal courts can enjoin state officials to conform future conduct to the requirements of

federal law. *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002) (quoting *Ex parte Young*).

### A.  The Plaintiffs Claims for Prospective Injunctive Relief Are Not Subject to Eleventh Amendment Immunity

Defendants argue that the plaintiff only seeks injunctive relief for "past alleged harms" with no continuing violation of federal law. MTD Memo., p. 9. Plaintiff's "Request for Relief" expressly requests "a name clearing hearing on his due process and civil rights claims." FAC, p. 24-25. While the body of the individual counts may not have precisely the same language, plaintiff's request for relief is sufficient to put defendants on notice of his claim for injunctive relief with respect to his due process and civil rights claims. Any claim that plaintiffs request for relief needs clarification warrants leave to amend, not dismissal with prejudice.

Defendants' argument that plaintiff's request for a name-clearing hearing does not square with the exception in *Ex Parte Young*, because it would not result in defendants conforming their future conduct to the requirements of federal law, is also unavailing. MTD Memo, p. 11. Plaintiff's request for a name clearing hearing is just that – a request that the Court order defendants to provide a name clearing hearing that complies with due process to counter the stigma associated with defendants' deprivation of plaintiff's liberty interests. *See Gunasekera v. Irwin*, 551 F.3d 461, 471 (6th Cir. 2009)(denying attempt to dismiss plaintiff's due process liberty interest claim and holding that in order to satisfy due process the defendant university was required to offer the plaintiff a name-clearing hearing to address the stigma the university inflicted on him). On remand, the trial court in *Gunasekera* ordered the defendant to provide a name clearing hearing and outlined the specific procedural requirements for the hearing. *Gunasekera v. Irwin*, 678 F. Supp. 2d 653, 664 (S.D. Ohio 2010)(". . . Defendants shall provide the [plaintiff] with the name-clearing hearing outlined in this Opinion).

Defendants in their official capacities are the only ones who can provide a name-clearing hearing. Monetary relief is not equivalent to, nor does it replace, a name-clearing hearing, which is specifically afforded to a plaintiff to counter the reputational and professional stigma created by an employer. The injunctive relief plaintiff seeks would not "have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kind of relief being of course prohibited by the Eleventh Amendment." *Mills v. Maine*, 118 F.3d 37, 55 (1st Cir. 1997)(internal quotation marks omitted)(quoting *Green v. Mansour*, 474 U.S. 64, 73 (1985)). Accordingly, the plaintiff's request for a name-clearing hearing is not barred by the Eleventh Amendment as it seeks the prospective enforcement of plaintiff's due process rights.

### B.  The Plaintiff Has Alleged Sufficient Facts to Support His Due Process Liberty Interest Claim

Defendants also contend that the Court lacks jurisdiction because the plaintiff has failed to plead sufficient facts to support his liberty interest due process claim. The Fourteenth Amendment's Due Process Clause provides that no state may "deprive any person of life, liberty, or property without due process . . ." U.S. Const. Amend. XIV, § 1. A viable claim must allege facts sufficient to demonstrate two factors: 1) the plaintiff has been deprived of an interest encompassed within the Fourteenth Amendment's protection of "life, liberty or property" and 2) the procedures accompanying the deprivation were constitutionally insufficient. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983); *Costa-Urena v. Segarra*, 590 F.3d 18, 26 (1st Cir. 2009). In determining the sufficiency of procedures accompanying a particular deprivation, a court must balance a number of factors, including: (1) the nature of the private and public interests involved; (2) the risk of erroneous deprivation accruing under the procedures used by the state; and (3) the probable

benefit of demanding additional procedural safeguards. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge, the Constitution's due process protections require the employer to provide the employee with an opportunity to dispute the defamatory allegations. *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972); *Codd v. Velger*, 429 U.S. 624, 627-28 (1977). An employee may suffer a deprivation of his protected liberty interest when his employer's discharge so damages his reputation as to significantly impair his subsequent job search. *Fajana v. Vance*, No. 15-13727-RWZ, 2016 U.S. Dist. LEXIS 199293, at *4-5 (D. Mass. July 6, 2016) (citing *Ortega-Rosario v. Alvarado-Ortiz*, 917 F.2d 71, 74 (1st Cir. 1990)). The employer's failure to provide an adequate name-clearing hearing is actionable under § 1983. *Buntin v. City of Bos.*, 813 F.3d 401, 406 (1st Cir. 2015).

To establish a right to a name-clearing hearing for a deprivation of a liberty interest, plaintiff must plead facts to establish the dismissal is grounded on charges which stigmatize the employee, and the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination. *Brennan v. Hendrigan*, 888 F.2d 189, 196 (1st Cir. 1989). The First Circuit applies the following five part test: (1) the alleged defamatory statement must seriously damage the employee's standing and association in the community; (2) the employee must dispute the statement as false; (3) the statement must have been intentionally publicized by the government; (4) the stigmatizing statement must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment; and (5) the government must have failed to comply with the employee's request for a name-clearing hearing. *Buntin v. City of Bos.*, 813 F.3d 401, 406 (1st Cir. 2015) (citing *Wojcik*

*v. Mass. State Lottery Comm'n.*, 300 F.3d 92, 102-03 (1st Cir. 2002)). The facts alleged by

plaintiff, when taken in his favor at this early stage of the case, meet or exceed these

requirements.

  **1. Coupled with the July 8 Suspension and the October 19, 2020, Termination, Statements That Plaintiff Was Forced to Make to His Staff and Third-Party Stakeholders Have Substantially Damaged the His Standing and Association in the Community**

 Plaintiff has alleged that the defendants drafted and required him to present statements to

his co-workers and community stakeholders which, in effect, constituted a confession of serious

fault and misjudgment related to his past and ongoing association with Kappa Gamma. See

Exhibit A (defendants mandating plaintiff make their drafted statements to all MCDHH

employees and external stakeholders). Plaintiff was not allowed to deviate from the script

defendants had drafted for him. Defendants required plaintiff to issue the statements in writing

and to personally deliver them in a series of Zoom meetings. The recipients of the statements

were both MCDHH employees and outside key stakeholders in the deaf and hard of hearing

community in Massachusetts. Defendants did not disclose that the statements were theirs and that

they had phrased the statements in a way that plaintiff was admitting significant fault and

accepting responsibility for taking part in what was alleged to have been racially offensive and

antisemitic conduct.

 The statements, attached in Exhibit A, conveyed a false and defamatory impression about

plaintiff, statements that he was coerced to make. The statements intimated and inferred that

because of his (white) "privilege", plaintiff was a racist and anti-Semitic, that he now renounced

Kappa Gamma as a racist association worthy of disavowal and disassociation and that he now

needed to apologize for his conduct. The statements contained the following language, in the

form of an admission by plaintiff that he had acted poorly and unprofessional: 1) " . . . I

understand that due to *my own privilege*, I could not see the damage done by this organization

and its misguided traditions" (emphasis added); 2) "I want to reiterate again that I disavow my

association with the organization." <u>Exhibit A</u>. These were false impressions formulated by

plaintiff's superiors to be delivered by plaintiff to third parties. As such they are actionable.

*Brennan v. Hendrigan*, 888 F.2d at 196 (quoting *Codd v. Velger*, 429 U.S. at 628  (employer's

creation and dissemination of a false and defamatory impression about an employee in

connection with his termination).

      The deaf and hard of hearing community's response to the communication of the

defendants' mandated statements based on their "communication plan" was swift and

overwhelmingly negative. The Union penned a letter to Governor Baker, specifically the day

before plaintiff's involuntary suspension on July 9 stating: "The Commissioner's blasé attitude

and dismissive response left much to be desired."  FAC ¶ 59. Defendants kept silent, apparently

never informing the Union that it had drafted the Commissioner's response, mandated its roll-out

and managed every aspect of its communication. FAC ¶ 60.

      Defendants' solicitation of workplace complaints by plaintiff's staff occurred only *after*

they directed him to confess fault for having been a member of Kappa Gamma   Plaintiff alleges

defendants engaged in the biased, discriminatory pursuit of complaints against him after July 8 in

order to create pre-text for their decision to later terminate him. None of the defendants' three

subsequent investigations were preceded by disclosure to plaintiff of the exact complaints made

against him or the names of the complainants. Plaintiff has been left to piece together the facts

and circumstances of his termination with limited knowledge of what happened, despite requests

for documentation and a name-clearing hearing. Defendants' attempt to dismiss plaintiff's claims

at this early juncture should be denied as plaintiff is entitled to learn through discovery the details surrounding what happened and, if necessary, amend his allegations accordingly.

### 2.   The Plaintiff Disputed the Statements as False

Despite being in a difficult position for fear of losing his job, coupled with the defendants' mandate that he make the statements as drafted, the plaintiff objected to the statements and sought to make changes. Exhibit A, p. 1. Plaintiff also complained that the statements seemed cold and would not be well received, which later proved to be true. In addition, after his termination, plaintiff hired counsel, and challenged the post-termination statement made by defendants by requesting a name-clearing hearing, which defendants rejected. The circumstances surrounding the drafting of the statement, plaintiff's objections about the statement and the resulting presentation of the statement are factual issues which warrant development in discovery.

### 3.   The Statements Were Intentionally Disseminated/Publicized by the Defendants

"To intentionally publicize an allegation, the government must publicly air defamatory statements through, e.g., "public meetings or . . . the press." *Burton v. Town of Littleton*, 426 F.3d 9, 16 (1st Cir. 2005). Personnel records or interagency communications shielded from public view, however, do not count as intentional publications. *See id.* at 17 (public school did not intentionally publicize child abuse allegations against fired teacher by memorializing them in a letter to Commissioner of Education). So cabined, this constitutional tort does not constrain the state's essential bureaucratic and managerial functions—only by overstepping these boundaries will the government expose itself to liability. *Fajana v. Vance*, No. 15-13727-RWZ, 2016 U.S. Dist. LEXIS  at *4-5 (D. Mass. July 6, 2016).

There are sufficient alleged facts to show that the statements, made in writing and over

Zoom, were intentionally publicized. The defendants drafted and ordered the plaintiff to make the defamatory statements, to both his colleagues and external "stakeholders." While the plaintiff made (or, "signed") the statements, the words were the defendants.' The mandate to make and distribute the statements verbatim, as drafted, was issued by the defendants. The statements were not interagency communications essential for bureaucratic purposes. Per defendants' "communication plans," the statements were delivered at different times, on several dates, to MCDHH employees and to "external stakeholders." By making the statements to a wide group of participants, including outside sources, defendants overstepped their managerial and bureaucratic functions and exposed themselves to liability.

The defendants may argue that they did not personally communicate (i.e., publish) the defamatory statements and, therefore, cannot be liable. The general rule in state libel law claims is that the defendant must be the one who publishes the defamatory statement. *See White v. Blue Cross & Blue Shield of Mass.*, 442 Mass. 64, 66-68, 809 N.E.2d 1034, 1036-37 (2004)(discussing and rejecting the doctrine of compelled self-publication as an exception to this general rule in the context of a discharged employee who felt compelled to explain to a prospective employer the circumstances of his prior discharge); *Contrast Landsberg v. Me. Coast Reg'l Health Facilities*, No. 08-CV-59-B-W, 2009 U.S. Dist. LEXIS 37390, at *35-36 (D. Me. Apr. 10, 2009)(adopting "compelled self-publication" exception when the defamed person is forced into a position of publishing a defamatory statement of himself of herself); *Hayes v. Sweeney*, 961 F. Supp. 467, 480 (W.D.N.Y. 1997)(noting the emerging exception in cases where the defamed person is underlined compelled to publish a statement to a third party)(citing *Mendoza v. SSC&B Lintas*, 799 F. Supp. 1502, 1511-12 (S.D.N.Y. 1992)(emphasis in original)). In the

present case, there is a complete absence of voluntariness in the plaintiff's issuance of the statements in question.

Plaintiff has found no federal case discussing the doctrine of compelled self-defamation within the context of the publication requirement necessary to establish name clearing/due process. Nor was any case found which discusses the factual circumstance where the defendant employer drafted the defamatory statement and then directed the employee to read the defamatory statement to co-workers and affiliated community stakeholders. The cases which reject compelled self-publication as a basis for liability discuss factual situations where an ex-employee "re-published" defamatory statements about his or her job termination to a prospective employer.

The facts at issue in this case are quite different and square with the exception's requirement that the defamed person be *compelled* to publish the defamatory statement to a third-party. "The compelled self-publication rule has been varyingly described as arising in circumstances that 'negate' voluntariness, or where the person defamed 'must republish defamatory statements' or is otherwise 'strongly compelled' to republish defamatory statements." *Landsberg v. Me. Coast Reg'l Health Facilities*, No. 08-CV-59-B-W, 2009 U.S. Dist. LEXIS  at *35-36,  quoting *Carey v. Mount Desert Island Hosp.*, 910 F. Supp. 7, 11-12& nn. 3, 5 (D. Me. 1995). As the plaintiff has alleged, and as supported by the e-mails attached as Exhibit A, the defendants wrote the statements, set a schedule for their communication, and required the plaintiff to communicate the statements verbatim. There can be no more compelling facts for application of the exception.

4.   **The Plaintiff Suffered an Injurious and Tangible Alteration of His Employment Status in Addition to the Devastating Injury to His Reputation**

For a public employer's defamatory statements to be actionable as a due process violation, the plaintiff must allege facts sufficient to meet a "stigma-plus" requirement, meaning "the reputational injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law." *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997) (citing *Paul v. Davis*, 424 U.S. 693, 701, 710-12 (1976). The reputational injury must also coincide in a time with the "alteration of status." *Brennan v. Hendrigan*, 888 F.2d at 195-96. In the employment context, the question is whether the defamation as alleged occurred "in the course of the termination" of the plaintiff's job. *Laureano-Agosto v. Garcia-Caraballo*, 731 F.2d 101, 104-05 (1st Cir. 1984) (citing *Paul v. Davis*, 424 U.S. at 710-12.

At the time the June 2020 statements were made, plaintiff was being investigated by defendant strictly related to his affiliation with Kappa Gamma. He had been interrogated at that time about his past and continuing involvement with Kappa Gamma. Shortly after the statements were made, on July 9, plaintiff was placed on a leave of absence, one day after Governor Baker was confronted (on July 7), at a press conference with the false Kappa Gamma allegation regarding plaintiff. There was no reason given to plaintiff for his suspension. The timing of the suspension is telling. Defendants thereafter *actively solicited* complaints against the plaintiff, despite his unblemished 17-year career as a commissioner in two states, but only after the Kappa Gamma allegations became public.

The course of events leading up to the plaintiff's suspension and later termination and the timing of those events is the key to this dispute, and to this case. Plaintiff has alleged facts to support the theory that the defendants solicited complaints to support a pre-textual reason for his termination after the Kappa Gamma allegations had hit the media and also after the plaintiff

communicated the self-incriminating statements required by the defendants – statements which were received in an overwhelmingly negative manner, and which set in motion the course of events leading directly to the plaintiff's termination. The dates that defendants notified plaintiff, first of his suspension and later his termination, are not necessarily factually coincident with both the decision when and why he would be put on a leave of absence and later terminated. As plaintiff avers, defendants' investigations into the plaintiff after he made the mandated statements were a pre-textual attempt at finding a reason to terminate the plaintiff other than his past and ongoing affiliation with his college fraternity.

The defendants seek to bolster their justification for the plaintiff's termination by attaching the unredacted Justine Plaut investigation report, without attaching other reports where specious, unfounded complaints against the plaintiff were found to lack merit or other information about the events leading up to the investigations of the plaintiff or the documents underlying the basis for the report. Cursory review of the report raises more questions than it answers, the report is cloaked in the biases of audism and linguicism against the plaintiff as a profoundly deaf employee. The report also fails to follow-up on leads that the Commission itself was at fault for negative employee morale and a poor work environment as it has a historical culture of institutional discrimination against profoundly deaf employees. MTD Memo., Exhibit A, p. 19, ¶¶ 3-4.[2]

---

[2] An MCDHH employee, a Deaf woman, after describing plaintiff as an excellent communicator, possessing an excellent team work ethic and fair to her as a woman, stated to the investigator: ". . . she believes Respondent is being 'set up' and everyone is 'pointing fingers' at the Respondent for agency-wide issues. . . . the issue at the agency is "systemic oppression" of the Deaf. MTD Memo, Exhibit A, p. 19, ¶¶ 3-4.

**5.   The Plaintiff Demanded a Post-Termination Hearing in Writing Which Was Denied by the Defendants**

Prior to filing suit, the plaintiff made a written demand for a name clearing hearing which the defendants rejected. FAC ¶ 75. The plaintiff did not attach his written demand or the defendants' reply to the FAC as such specificity is not required at this stage of the case.

**6.   Qualified Immunity Does Not Apply to a Claim for Prospective Injunctive Relief**

To the extent the defendants argue or infer that qualified immunity applies as a matter of law to the plaintiff's claim for a prospective injunction, the law is clear that qualified immunity does not apply to claims for injunctive relief. As the First Circuit has stated, the defense of qualified immunity "is totally immaterial" to a claim for injunctive relief under § 1983. *Lugo v. Alvarado*, 819 F.2d 5, 7 (1st Cir. 1987) (citing *Tubbesing v. Arnold*, 742 F.2d 401, 404 (8th Cir. 1984). As noted in *Lugo*, "[r]egardless of what happens to the damage claim in this case, the equitable requests stand on different footing." *Id.*

**C.   The Individual Defendants Are Not Insulated from Liability by Qualified Immunity**

Defendants argue that they are protected by qualified immunity from the plaintiff's First Amendment freedom of associations claims. Section 1983 provides a cause of action against persons who violate federal law while acting under color of state law. 42 U.S.C. § 1983. Qualified immunity protects a state official against § 1983 suits unless 1) the official violated the plaintiff's constitutional right and 2) that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts assess the "clearly established" requirement by asking whether the contours of the right were sufficiently clear and whether a

reasonable official under the specific circumstances would recognize that his conduct violated a constitutional right. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

### III.   Plaintiff Has Alleged a Violation of the First Amendment's Right to Freedom of Association

The required analysis to determine whether a First Amendment violation claim is viable in the circumstances alleged by plaintiff in his Amended Complaint is inherently fact laden and not typically ripe for decision on a motion to dismiss. *See URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12-13 (1st Cir. 2011)(First Circuit review of summary judgment decision on a fully developed record). Much of what the defendants argue about the plaintiff's association or lack of association with Kappa Gamma is speculative. Discovery will be necessary to explore Kappa Gamma at Gallaudet, Kappa Gamma International, Kappa Gamma's mission, enrollment criteria, size, local and international community involvement, involvement of alumni, its network, the purpose and scope of the activities engaged in by the local chapter and its alumni members' involvement in Gallaudet University, the premier university for deaf and hard of hearing students in the world.

Kappa Gamma at Gallaudet is not an association that just "meets and mingles" in college socials, as the defendants argue. As alleged in the FAC, Kappa Gamma has historically served as a significant network for professionals and others who have worked on issues that affect the deaf and hard or hearing communities, nationally and internationally. FAC, ¶ 44. While the plaintiff did not detail at great length his involvement with Kappa Gamma, the defendants are aware of his involvement as they investigated his continued involvement relating to a speech he gave in 2018 at a Kappa Gamma banquet, his continued donations and involvement with Kappa Gamma. FAC, ¶ 89.

The plaintiff intends to prove, and accordingly can amend his FAC to particularly allege, plaintiff's forced disavowal not only severed his relationship with Kappa Gamma's university fraternity but, also, and more saliently, his ongoing and continued involvement with Kappa Gamma International, Inc. (KGI), which is the national and international non-profit alumni association of Kappa Gamma. Honorary membership in KGI is determined by the KGI board with input and recommendations from the chapters and individual members. The honorary memberships are inducted every three years and are limited to adults who exemplify great character and/or leadership in the community, such as meritorious service, to the Deaf Community.[3] https://my.gallaudet.edu/intranet/announcements-archive/kappa-gamma-international-announces-new-honorary-members.   The purpose of KGI is to "[f]oster the advancement of scholarship, leadership, fellowship, character, and service to both within and outside the deaf community."[4]

The plaintiff is also the co-founder of the New England Chapter of KGI. In addition, on a regular basis, plaintiff attended 1) KG/KGI conclaves during homecoming weekend as part of the Gallaudet University Alumni Association where he had the opportunity meet and network with alumni and students of KG/KGI; 2) KG gatherings arranged by KGI at the National Association of the Deaf's biennial conference; and 3) KG's 100th Anniversary Reunion. This is in addition to the speech he was asked to give in 2018 as a guest speaker at KG's annual banquet. The plaintiff's forced disavowal precludes him from participating in any and all KG and KGI events for life. In addition, the plaintiff's three deaf sons, may well attend Gallaudet University

---

[3] The KG and KGI website is currently under construction, and therefore, the archive version is being referenced.
[4] https://web.archive.org/web/20190901162932/http://kappagamma.com/mission

and join KG and eventually KGI. Because of his forced disavowal, the plaintiff will be banned from participating with his sons in KG and KGI should they become members.

Freedom of speech embraces "'freedom to engage in association for the advancement of beliefs and ideas.'" *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005)(quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). The freedom of expressive association springs from the fundamental, individual right to free speech which could not be properly safeguarded "'unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.'" *Id.*(quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). In addition, the free speech right inherent in associational relationships may pertain to a wide array of ends, such as "political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). To fall within the First Amendment's protections, a group must "engage in some form of expression, whether it be public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S. Ct. 2446, 2451 (2000). Moreover, and more than apt and applicable to the facts of their case, government denial of rights and privileges because of a citizen's association with a perceived unpopular organization is prohibited by the First Amendment. "[G]uilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government," is an impermissible basis upon which to deny First Amendment rights. *Healy v. James*, 408 U.S. 169, 185-86 (1972)(quoting *United States v. Robel*, 389 U.S. 258, 265 (1967)).

The scope of the right to freedom of association is dependent on the scope of the underlying individual rights of expression. *Wine & Spirits Retailers*, 418 F.3d at 50 (there is no right of association in the abstract). The Supreme Court has identified two types of protected freedom of association: (i) "'choices to enter into and maintain certain intimate human

relationships'" and (ii) association "'for the purpose of engaging in those activities protected by the First Amendment.'" *URI Student Senate v. Town of Narragansett*, 631 F.3d at 12-13 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). These two categories are often referred to as rights to "intimate association" and "expressive association." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 438 (3d Cir. 2000)(describing right of intimate association as a fundamental element of personal liberty and expressive association as springing from the First Amendment's protected activities of speech, assembly, to petition government and the exercise of religion). However, the right to association does not extend to a general right to congregate and socialize or generically "mix and mingle." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1 at 12-13.

### A. The Plaintiff Has Plead Sufficient Facts to Support a First Amendment Right in an Intimate Association with Kappa Gamma and Its Members

The vast majority of the decisions addressing freedom of association claims are trial court summary judgment decisions or appeals of summary judgment decisions. This underscores the factual nature of the analysis, which is not appropriate on a record which has not been developed by discovery. Accordingly, when discussing the plaintiff's intimate association claim without the aid of discovery, the defendants make numerous false assumptions about the mission and purpose of Kappa Gamma, the plaintiff's past and ongoing involvement with Kappa Gamma and Kappa Gamma's advocacy for and significance to the deaf and hard of hearing community.

Despite these arguments, the plaintiff 's Amended Complaint is sufficient to avoid dismissal. In analyzing the nature of a given relationship, relevant factors to consider include a group's "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Roberts v. United States Jaycees*, 468 U.S. at 620.

As alleged argued above, Kappa Gamma has historically served as a significant network for professional and others who have worked on issues that affect the deaf and hard or hearing communities, nationally and internationally. FAC, ¶ 44.  KGI, in turn, is a select association of qualified KB alumni who engage in service to the Deaf community. The plaintiff, as the co-founder of the New England Chapter of KGI is intimately involved with KGI. Accordingly, the plaintiff has alleged sufficient facts to demonstrate that the plaintiff's association with KG and KGI is merely low level social interaction.

### B.  The Plaintiff Has Plead Sufficient Facts to Support a First Amendment Expressive Association Claim

The defendants spend little time discussing the significance of the plaintiff's expressive association claim relating to his involvement with Kappa Gamma. Plaintiff's expressive association claim easily surmounts the low legal burden required for such a claim. *Boy Scouts of America v. Dale*, 530 U.S. at 640 (citing a group merely has to "engage in some form of expression, whether it be public or private.").

As noted above, KG, and particularly, KGI engages in expressive association which is protected by the First Amendment. The plaintiff was a guest speaker at a 2018 KG event where he discussed issues pertinent to the deaf community. Moreover, KGI membership requires character and/or leadership, such as meritorious service, to the Deaf Community. The plaintiff's involvement with KGI, as the co-founder of its New England Chapter, clearly encompasses this protected expressive purpose, as does his contribution to Kappa Gamma as a speaker in 2018. While, the role of Kappa Gamma and KPI can be developed in discovery, the plaintiff meets the low threshold of establishing "some form of expression."

### C.  The Plaintiff's First Amendment Freedom of Association Rights Were Clearly Established

With respect to the "clearly established" standard, the First Circuit has stated:

> The law is "clearly established" if courts have ruled that "materially similar conduct was unconstitutional," or if there is a previously identified general constitutional principle that applies "with obvious clarity to the specific conduct at issue." *Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007). In other words, a right is clearly established if a reasonable official is on clear notice that what he or she is doing was unconstitutional. *Costa-Urena*, 590 F.3d at 29.

*Cortes-Reyes v. Salas-Quintana*, 608 F.3d 41, 52 (1st Cir. 2010). In addition, the right at issue must have been "reasonably well settled" at the time of the conduct at issue. *Id.* (quoting *Martinez v. Colon*, 54 F.3d 980, 988 (1st Cir. 1995)). The qualified immunity analysis requires the general right be placed in a reasonably specific context. *Jordan v. Carter*, 428 F.3d 67, 74-75 (1st Cir. 2005) (quoting *Wagner v. City of Holyoke*, 404 F.3d 504, 509 (1st Cir. 2005)). However, an undeveloped record is an obstacle to applying the qualified immunity analysis. *Id.* at 74-76 ("We therefore cannot eliminate the possibility that the facts once developed will show a violation of clearly established law.).

The First Amendment rights asserted by the plaintiff are not new or controversial rights. First Amendment freedom of association is a bedrock Constitutional principle. The Supreme Court seminal cases in this area, *Roberts* and *Dale*, were decided in 1984 and 2000, respectively. There has been little change in Supreme Court jurisprudence in this area. *See A.M. v. N.M. Dep't of Health*, 117 F. Supp. 3d 1220, 1254-55 (D.N.M. 2015)(discussing the history of the right of expressive association noting that the Supreme Court recognized a First Amendment right to association well before 1979 and adopted the term "expressive association" in 1984).

Moreover, a reasonable state official under the circumstances at issue would clearly recognize that mandating the plaintiff to confess to alleged past professional insensitivity and misconduct and to disavow and cancel his relationship with Kappa Gamma in such an explicit

24

and intentional way violates the plaintiff's constitutional rights to freedom of association. As alleged by the plaintiff, the defendants conducted a specific investigation into Kappa Gamma and the plaintiff's relationship to Kappa Gamma. This investigation included his involvement with Kappa Gamma as a student, his involvement as an alumnus, his support of Kappa Gamma and Kappa Gamma International (a non-profit association of Kappa Gamma alumni), his invitation to and appearance as a speaker at a Kappa Gamma event in 2018 and his listing of Kappa Gamma on his LinkedIn page. After this investigation, the defendants specifically demanded that the plaintiff disavow his relationship to Kappa Gamma by drafting a statement of disavowal. The defendants then re-wrote the plaintiff's initial short statement, turning it into a more elaborate statement which not only included a disavowal but also an apology and a proclamation that his "privilege" caused him to fail to fully comprehend the meaning of Kappa Gamma's alleged actions.

Moreover, what the defendants concluded about Kappa Gamma and the plaintiff's relationship to Kappa Gamma has not been discovered. The facts to this point, and as plead by the plaintiff, show that the defendants' primary purpose was to force the plaintiff to disavow and sever all ties with Kappa Gamma in all its forms. Any reasonable public officials in the defendants' positions would have known that they were violating plaintiff's clearly established right to freedom of association. [5] *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)(absent extraordinary circumstances, "[i]f the law was clearly established, the immunity defense should ordinarily fail, since a reasonably competent public official should know the law governing his

---

[5] Indeed, defendants' decision to pursue termination based on the purported creation of a hostile workplace, and not the Kappa Gamma membership, is in effect an acknowledgement that the freedom of association right was one that plaintiff clearly had with respect to Kappa Gamma.

conduct"). Moreover, "if the defense claims such extraordinary circumstances, the plaintiff is entitled to discovery to probe those circumstances." *Lugo v. Alvarado*, 819 F.2d at 7 n.2.

### D.  The Governor Is a Proper Defendant with Respect to the Plaintiff's Due Process Claim for a Name-Clearing Hearing

The defendants argue that the Governor is not a proper defendant with respect to the plaintiff's federal civil rights claims because he is not alleged to have engaged in any wrongful conduct. MTD Memo., p. 28. While this argument is well taken with respect to plaintiff's freedom of association claim (Count 5), it is misplaced with respect to his claim for a name-clearing hearing under his due process liberty interest claim (Count 6). While it is true that Governor Baker is not listed in the e-mails attached as Exhibit A, which evidence the process leading up to and the presentation of the alleged defamatory statements, Governor Baker's involvement is not fully known. For example, to what extent was he involved in the issuance of the statement, the plaintiff's suspension, or the plaintiff's termination. Moreover, it is also not known to what extent he was involved in the denial of plaintiff's post-termination hearing request.

However, the defendants argue that the plaintiff, per statute, was an at-will employee with no protected property interest in his job. MTD Memo., p. 12-13. The statute cited and relied on by the defendants states that the Commissioner is appointed by the secretary of health and human services "with the approval of the governor." M.G.L. c. 6, § 193. The converse inference can logically be drawn – the plaintiff's termination was subject to the approval of the Governor. Finally, the Governor, as the penultimate State executive involved in the hiring and firing of the plaintiff per statute, is a proper party withstanding for purposes of effectuating an ordering for prospective injunctive relief.

26

## <u>CONCLUSION</u>

For the reasons stated, the plaintiff requests that the Court deny the defendants' request

for the dismissal of the plaintiff's claims under section 1983.

On behalf of the Plaintiff,


*/s/ Philip N. Beauregard*
Philip N. Beauregard, BBO # 034780
Law Offices of Beauregard, Burke and Franco
32 William Street
New Bedford, Ma 02740
Tel. No. (508) 993-0333
pbeauregard@bbflawoffices.com

*/s/ Carlin Phillips*
Carlin Phillips, BBO #561916
Phillips and Garcia, P.C.
13 Ventura Drive
Dartmouth, Ma 02747
Tele. No. (508) 998-0800
cphillips@phillipsgarcia.com

27

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and copies were sent by first-class mail to those indicated as non-registered participants on September 14, 2021.


/s/ *Philip N. Beauregard*_____

Philip N. Beauregard, BBO # 034780
Law Offices of Beauregard, Burke and Franco
32 William Street
New Bedford, Ma 02740
Tel. No. (508) 993-0333
pbeauregard@bbflawoffices.com

/s/ *Carlin Phillips*_____

Carlin Phillips, BBO #561916
Phillips and Garcia, P.C.
13 Ventura Drive
Dartmouth, Ma 02747
Tele. No. (508) 998-0800
cphillips@phillipsgarcia.com