UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEVEN A. FLORIO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| COMMONWEALTH OF | * | Civil Action No. 1:21-cv-10665-IT |
| MASSACHUSETTS, GOVERNOR | * | |
| CHARLES E. BAKER, individually and in | * | |
| his official capacity, MARYLOU | * | |
| SUDDERS, individually and in her official | * | |
| capacity as secretary of Health and Human | * | |
| Services, CATHERINE STARR, | * | |
| individually and in her official capacity as | * | |
| Secretariat Human Resources Officer, and | * | |
| ERICA CRYSTAL, individually and in her | * | |
| official capacity as Executive Office of | * | |
| Health and Human Services Labor Relations | * | |
| Director and Deputy General Counsel for the | * | |
| Commonwealth of Massachusetts, | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM & ORDER**

March 7, 2022

TALWANI, D.J.

Plaintiff Steven A. Florio, the former Commissioner for the Massachusetts Commission

for the Deaf and Hard-of-Hearing, brings this action against the Commonwealth of

Massachusetts, Governor Charlie Baker, and three other state officials.[1] In his Amended

Complaint [Doc. No. 4], Florio brings claims under 42 U.S.C. § 1983 alleging, inter alia,

violation of his First Amendment rights (Count V) and violation of his due process rights (Count

VI). Now pending before the court is Defendants' Motion to Dismiss [Doc. No. 12], which the

---

[1] Secretary of Health and Human Services Marylou Sudders, Human Resources Officer
Catherine Starr, and Labor Relations Director and General Counsel Erica Crystal.

court granted in part, without prejudice, on the parties' <u>Joint Notice</u> [Doc. No. 20] that all claims

against Defendants other than those against the individual Defendants in Counts V and VI had

been resolved or would be addressed in another forum. Partial Order [Doc. No. 21]. For the

following reasons, the remainder of the motion is GRANTED.

I.      **Factual Allegations[2]**

Florio "is a dedicated advocate for the deaf and hard of hearing population" whose

"efforts have had a positive and rewarding impact on the lives of many people." Am. Compl.

¶ 35 [Doc. No. 4] (quoting Rhode Island House and Senate Resolutions passed to honor Florio's

contributions to the deaf and hard of hearing population in the state). In February 2019,

Governor Charlie Baker nominated Florio for Commissioner of the Massachusetts Commission

for the Deaf and Hard-of-Hearing ("MCDHH"). <u>Id.</u> at ¶ 31. Florio had "an excellent professional

reputation" in the deaf and hard of hearing community that earned him widespread praise on

both a national and international scale. <u>Id.</u> at ¶¶ 31–40. Florio became Commissioner of

MCDHH on February 19, 2019, and continued in that role until he was terminated on October

19, 2020. <u>Id.</u> at ¶¶ 31, 69.

Florio is a 1992 graduate of Gallaudet University, a university for the deaf and hard of

hearing. <u>Id.</u> at ¶ 41. Florio joined the Gallaudet chapter of the Kappa Gamma fraternity in April

1991 and remained a member through the Spring of 1992. <u>Id.</u> at ¶ 43. Kappa Gamma "was

established in 1901 and has been known to be synonymous with Gallaudet," having served as "a

significant network for professionals and others who have worked on issues that affect the deaf

and hard of hearing communities nationally and internationally." <u>Id.</u> at ¶ 44. Around its

---

[2] Unless otherwise noted, the factual allegations are drawn from the <u>Amended Complaint</u> [Doc. No. 4]. The court has not considered the investigative report that Defendants filed as Exhibit B [Doc. No. 14-2] in support of their <u>Motion to Dismiss</u> [Doc. No. 12]. <u>See</u> Fed. R. Civ. P. 12(d).

founding, Kappa Gamma began incorporating ceremonial robes into its rituals and adopted the "Bellamy Salute" for use at formal fraternity functions. Id. at ¶¶ 3, 45–46. The Bellamy Salute "involves a raised right arm and hand, which some believe resembles the salute used in Nazi Germany." Id. at ¶ 3. These traditions remained a part of the Kappa Gamma tradition when Florio attended Gallaudet in the early 1990s. Id. at ¶ 47.

On June 5, 2020, a blogger falsely identified Florio in a 1990 Gallaudet University yearbook photo depicting members of Kappa Gamma doing the Bellamy Salute. Id. at ¶ 50. In the same post, the blogger included false claims that the fraternity's salute was affiliated with the Nazi salute, despite the Bellamy Salute having "been used by the fraternity since 1901, predating the Nazi use of a similar salute." Id. at ¶¶ 50–51.

Though claims that Florio was pictured in the controversial yearbook photo were false, the Deputy Legal Counsel for the Commission reported the blogger's allegations to the Secretariat Legal Counsel for the Executive Office of Health and Human Services. Id. at ¶¶ 50–52. Two formal investigations by the Commonwealth followed.[3] Id. at ¶¶ 66–67.

The Executive Office of Health and Human Services ("EHS") Office of Diversity and Civil Rights conducted the first investigation ("EHS Investigation") with the involvement of its Labor Relations Director, Defendant Crystal. Id. at ¶¶ 28, 66. The EHS Investigation centered around Florio's alleged connection to racism and antisemitism within Kappa Gamma. Id. at ¶ 66. EHS allowed Florio to have counsel present when he met with investigators, but stopped Florio's attorney from participating or obtaining information pertaining to the investigation. Id. During the EHS investigation, "Defendants encouraged and solicited staff to make complaints about

---

[3] Following his termination, Florio learned that the Commonwealth had conducted two additional investigations into complaints made against him. Id. at ¶¶ 71–73. In both cases the complaints were found to be unsubstantiated. Id. at 72.

[Florio]." Id. at ¶ 63. As an outgrowth of the solicitation, at least one additional investigation was formally initiated. Id.

The Human Resources Division, Center of Expertise conducted the second investigation ("HRD Investigation") with the involvement of Human Resources Officer, Defendant Starr. Id. at ¶¶ 27, 67. The HRD Investigation centered around Florio's conduct as Commissioner of MCDHH and stemmed from complaints of discrimination and harassment made by MCDHH employees during the EHS Investigation. Id. at ¶¶ 63, 67. Florio was not permitted counsel in connection with this investigation. Id. at ¶ 67.

While the EHS investigation was ongoing, Defendants Sudders, Starr and Crystal instructed Florio to draft a statement disassociating himself from Kappa Gamma and apologizing to MCDHH staff, employees, and community stakeholders for his involvement with the fraternity. Id. at ¶¶ 54–57. Florio prepared an initial statement, which he sent to Sudders, Starr and Crystal. Upon their review, the three Defendants heavily edited the statement, adding "cold" language that described Florio as unaware of his own privilege, "portray[ing] him in a false light and not in his best interest." Id.; see also Iterative Drafts, attached as Ex. A to Pl. Opp. [Doc. No. 23-1]. They instructed Florio to read the revised statement verbatim in a series of Zoom and voice calls with MCDHH employees and stakeholders. Am. Compl. ¶¶ 57–58 [Doc. No. 4]. The statement was negatively received. The local union representing MCDHH employees sent Defendant Governor Baker a letter criticizing Florio's handling of the allegations of racism within Kappa Gamma. The letter described Florio's response as "dismissive" and "blasé." Id. at ¶ 59. The union's letter also contained "defamatory and misleading" statements including that Florio had "admitted to dressing as a Nazi and saluting while wearing garb resembling the uniforms of the Ku Klux Klan as a member of Kappa Gamma." Id. at ¶ 58. The Boston Globe

obtained a copy of the union's letter and published it, further damaging Florio's reputation. Id. at ¶ 61. As a further consequence of delivering the scripted statement, the union arranged a vote of "no confidence" in Florio. Id. at ¶ 58. Despite Sudders, Starr and Crystal playing a role in drafting the statement that was the source of such criticism, they never informed the union or its members of their involvement and did not intervene when Governor Baker responded publicly to the union's letter with a promise to investigate. Id. at ¶¶ 59–62.

Florio cooperated with investigators, meeting with them at least fifteen separate times between June 5, 2020, and September 3, 2020. Id. at ¶ 68. As a result of the investigations, Florio was placed on administrative leave on July 9, 2020, but continued to cooperate. Id. at ¶ 65; see also Florio's Suspension Letter, Exhibit B in Support of Florio's Opposition [Doc. No. 23-2]. On October 19, 2020, after the second investigation concluded, Florio was terminated. The Termination Letter from Secretary Sudders cited internal complaints unrelated to Florio's fraternity membership as the reason for his termination. Am. Compl. ¶¶ 31, 69, 71–74 [Doc. No. 4]; see also Termination Letter, Exhibit A in support of Defendants' Motion to Dismiss [Doc. No. 14-1] and Exhibit C in support of Florio's Opposition [Doc. No. 23-3].[4] Following his termination, Florio requested a post termination name clearing hearing, but his request was denied. Am. Comp. ¶ 75 [Doc. No. 4]. As a result of his termination, Florio has been "permanently and effectively banned [] from working as an executive in the deaf and hard-of-hearing community"; he has since applied to executive level positions and has not been given any opportunities to interview. Id. ¶ 76.

---

[4] The court considers the Suspension Letter [Doc. No. 23-2] and the Termination Letter [Doc. Nos. 14-1, 23-3] as reflecting Defendants' undisputed communication to Florio, but not for the truth of the matters asserted there.

## II.     Standard of Review

### A.     Lack of Subject Matter Jurisdiction under Fed. R. Civ. P. 12(b)(1)

A motion to dismiss for lack of constitutional standing is properly brought as a challenge to the court's subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). See Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998). The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. Id. A court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id.

A challenge to the court's subject matter jurisdiction must generally be addressed before addressing the merits of a case. See Acosta-Ramirez v. Banco Popular de Puerto Rico, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case").

### B.     Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6)

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, "an adequate complaint must include not only a plausible claim but also a plausible defendant." See Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 594 (1st Cir. 2011).

       *C.*    *Extrinsic Evidence*

      In ruling on a motion to dismiss, "a judge can mull over 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" Lydon v. Local 103, Int'l Bhd. Of Elec. Workers, 770 F.3d 48, 53 (1st Cir. 2014) (quoting Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (alteration in original)); see also Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) ("[C]ourts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint" (internal quotations and original alterations omitted)). If other matters outside the pleadings are presented to the court, the court may exclude such matters or may treat the motion as one for summary judgment, with all parties given a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ. P. 12(d).

## III.  Discussion

      Florio alleges Defendants violated his rights to free association and due process under 8 U.S.C. § 1983. Section 1983 creates a civil cause of action against an individual acting under color of state law who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have

worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). In addition, because qualified immunity shields government officials from personal liability unless their "conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known," a claim for damages under Section 1983 survives only if the alleged violation was of a "clearly established" right. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Defendants do not dispute that they were, at all times relevant, acting under color of state law. At issue here is whether the rights Florio alleges Defendants deprived him of are legally cognizable rights and if so, whether Defendants are insulated by qualified immunity or sovereign immunity.

*A.     Freedom of Association (Count V)*

Florio brings claims for damages against the individual Defendants in their individual capacities. Florio alleges Defendants' conduct violated his First Amendment right to associate with the Kappa Gamma fraternity. Defendants respond that Florio's membership in Kappa Gamma is not a protected associational interest and that Florio's freedom of association claim is barred by qualified immunity.

To state a claim for associational discrimination in public employment, a plaintiff must allege facts to establish that "his conduct was constitutionally protected" and that the protected conduct was a motivating factor in the adverse employment action. Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011); Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 56 (1st Cir. 1990) ("At a bare minimum, plaintiff's burden at the pleading stage [is] to allege facts which, if proven, would demonstrate [adverse employment action] was brought about by discrimination on the basis of some constitutionally safeguarded interest"), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004).

The First Amendment protects two distinct forms of associational relationships: (1) intimate association and (2) expressive association. See Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984). Defendants contend that Florio failed to allege facts to establish a protected relationship under either category. Florio counters that the facts alleged in his Amended Complaint [Doc. No. 4] demonstrate his membership is Kappa Gamma is protected under both categories. The court considers each of the associational rights separately.

      1.    Intimate Association

Intimate associations are protected "as an intrinsic element of personal liberty." Roberts, 468 U.S. at 620. The right protects individuals' "choices to enter into and maintain certain intimate human relationships . . . [from] undue intrusion by the State" and acts to "safeguard[] the individual freedom that is central to our constitutional scheme." Id. at 617–18. These relationships are arrayed on a spectrum from the most intimate and vigorously protected—those associated with fundamental rights—to the most superficial and generally unprotected—those involving social and business ties. Id. at 620; see also City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) (no generalized right to "social association"). Assessing the strength of an associational interest that falls between these established categories, "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on [the] spectrum from the most intimate to the most attenuated of personal attachments." Id. at 619–20 (considerations should include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent"); Poirier v. Massachusetts Dep't of Correction, 558 F.3d 92, 95 (1st Cir. 2009). Relationships on the more protected end of the spectrum are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship" and

generally involve "personal bonds" that have "played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." Roberts, 468 U.S. at 618–20.  Where the relationship falls on this spectrum—the strength of the associational interest—dictates the level of scrutiny that the court should apply. See Poirier, 558 F.3d at 95.

Here, Florio alleges he had a constitutionally protected interest in associating with Kappa Gamma and that the Defendants interfered when they "force[d] [him] to disavow and denounce any past, current or future association with [the fraternity]." Am. Compl. ¶¶ 111–12 [Doc. No. 4]. But membership in a fraternity is not a categorically protected "intimate association." See, e.g., Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of New York, 502 F.3d 136, 144, 146–47 (2d Cir. 2007) (concluding the "[f]raternity lack[ed] the characteristics that typify groups with strong claims to intimate association "[b]ased on its size, level of selectivity, purpose, and inclusion of non-members" and because the fraternity's goals do not "depend for their promotion on close-knit bonds"). Therefore, "'a careful assessment'" of the characteristics of Florio's relationship with Kappa Gamma is necessary to determine the degree of scrutiny the court should apply to his claim. Poirier, 558 F.3d at 95 (quoting Roberts, 468 U.S. at 620).

Here, Florio does not allege sufficient facts to support his allegation that his membership in Kappa Gamma constitutes a constitutionally protected interest in an intimate association. His Amended Complaint [Doc. No. 4] lacks detail on the size, selectivity or exclusivity, or purpose of his association with Kappa Gamma. The facts Florio does allege—that Kappa Gamma has "historically served as a significant network for professionals and others who have worked on issues that affect the deaf and hard of hearing communities," that "numerous" Gallaudet Presidents and University board members have been members, and that the fraternity has been synonymous with Gallaudet University—suggest his relationship with the fraternity may lack the

requisite intimacy and inward purpose to warrant constitutional protection. See Am. Compl. ¶¶ 44, 47 [Doc. No. 4].

But even if Florio could allege additional facts to support his claim that the fraternity amounts to an intimate association, Defendants are protected here under the doctrine of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. And here because it would not have been clear to Defendants whether membership in Florio's college fraternity is a protected intimate associational interest, to the extent Florio's First Amendment claim is based on intimate association, the claim must be dismissed on qualified immunity grounds.

    2.    <u>Expressive Association</u>

Expressive association protects the right to associate "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts, 468 U.S. at 618. In the context of public employment, "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 (1990). This ensures employees in "nonpolicymak[ing]" positions cannot be "drummed out of public service" for partaking in a constitutionally protected relationship. Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996); see Barry, 661 F.3d at 704 (internal quotation omitted). But this right "does not protect against all deprivations arising out of an act of association"; rather, the associational relationship, "or refusal to associate, must be political in

nature or implicate some other constitutional concern." Barry, 661 F.3d at 704; Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 57 (1st Cir. 1990) ("The Constitution may be interposed as a barrier to state action only to the extent that the targeted association is characterizable in terms of some particular constitutional concern."), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004); see also Elrod v. Burns, 427 U.S. 347, 357 (1976) (plurality) (First Amendment protects "freedom to associate with others for the common advancement of political beliefs and ideas"). Thus, "mere personal association without political overtones does not implicate First Amendment concerns, and 'the burden of proof [is] on the plaintiff to demonstrate that her association was political and not personal.'" Barry, 661 F.3d at 704 (quoting Padilla–Garcia v. Guillermo Rodriguez, 212 F.3d 69, 76 (1st Cir. 2000).

Here, Florio does not allege facts sufficient to establish that his relationship with Kappa Gamma was expressive in nature. Rather, Florio describes his association with Kappa Gamma as one of a student joining a college fraternity. See Am. Compl. ¶¶ 43–44 [Doc. No. 4]. Florio does not allege that he joined Kappa Gamma for expressive purposes or that the fraternity itself engaged in protected activities. To the contrary, Florio asserts that the activities at the center of the Kappa Gamma controversy—the Bellamy Salute and ceremonial robes—were not forms of expressive speech, but rather social rituals. See id. at ¶¶ 45–46, 51. In his Opposition [Doc. No. 23], Florio adds that his forced disavowal of Kappa Gamma included a requirement that he denounce his membership in the affiliated non-profit alumni association, Kappa Gamma International ("KGI"). KGI was established to "[f]oster the advancement of scholarship, leadership, fellowship, character and service [] both within and outside the deaf community" and acts as a significant network for alumni who work in the deaf and hard of hearing communities,

both nationally and internationally. Opp'n 20 [Doc. No. 23]; see Am. Compl. ¶ 44 [Doc. No. 4]. Florio does not contend, however, that KGI is an advocacy organization or otherwise engages in protected activities and fails to assert sufficient facts to determine whether it engaged in expressive activities.

Allowing Florio to remedy this deficiency by amending his complaint, however, would be futile. Here too, because a fraternity is not inherently an expressive organization engaged in protected speech, Sudders, Starr, and Crystal's instruction that Florio, as a public employee, disavow his relationship with Kappa Gamma was not a clearly established constitutional violation and therefore, to the extent Florio's First Amendment claim is based on expressive association, it must be dismissed on qualified immunity grounds.

### B.    Procedural Due Process (Count VI)

Florio alleges he was deprived of procedural due process in connection with his termination. His claim is against the individual Defendants in their official capacities, and he seeks injunctive relief in the form of a post termination name clearing hearing. See Jt. Not. [Doc. No. 20]. Defendants move to dismiss this claim on grounds of sovereign immunity and for failure to state a claim.

#### 1.    Sovereign Immunity

Defendants argue Florio's due process claim against the individual Defendants in their official capacities are barred by sovereign immunity and should therefore be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

"[N]either a state agency nor a state official acting within his official capacity may be sued for damages in a section 1983 action." Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir

1991). Florio does not dispute that his Section 1983 claims seeking monetary relief are unavailing as to Defendants in their official capacities. Jt. Not. 2 [Doc. No. 20].

State officials may be sued in their official capacities, however, for prospective injunctive relief. See Papasan v. Allain, 478 U.S. 265, 277–78 (1986); Wilson v. Brown, 889 F.2d 1195, 1197 n.4 (1st Cir. 1989) ("[I]t is well settled that while prospective injunctive relief is permissible, retrospective relief is barred [by the Eleventh Amendment]") (citing Edelman v. Jordan, 415 U.S. 651, 668 (1974)). Where a plaintiff seeks relief to remedy past injuries rather than to prevent future harm, sovereign immunity bars the claim against the state officials in their official capacities, regardless of the label the plaintiff uses for the relief she seeks. See Papasan, 478 U.S. at 278 ("Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant").

Here, Florio seeks a name clearing hearing. Defendants argue that Florio is seeking to remedy past injuries, while Florio contends that he is seeking a form of prospective injunctive relief; Florio argues that a name clearing hearing is the only way to get relief from "the reputational and professional stigma created by" the alleged constitutional violations. Opp'n 9 [Doc. No. 23].

Florio's due process claim alleges that by denying his procedural due process before and after his termination, Defendants unconstitutionally interfered with his protected liberty interest in obtaining work in his field. He contends that the alleged deprivation of due process is ongoing and the lack of procedural protection is preventing him from obtaining employment. He seeks a name clearing hearing therefore, not to remedy the past reputational harm caused by the violation of his right to a termination in accordance with the standards required by the due process clause,

14

but to remedy the ongoing interference with his fundamental right to pursue employment in his chosen profession. The court finds as such that a name clearing hearing is a form of prospective relief and therefore that sovereign immunity does not bar Florio's due process claim.

        2.      <u>Failure to State a Claim</u>

To state a procedural due process claim under Section 1983, a plaintiff must allege facts sufficient to establish (1) that the plaintiff has been deprived of a protected interest and (2) that the defendants deprived him of that interest without due process. <u>Perez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 30 (1st Cir. 2008); <u>Ortega-Rosario v. Alvarado-Ortiz</u>, 917 F.2d 71, 73 (1st Cir. 1990) ("The Due Process Clause of the Fourteenth Amendment prevents a state from discharging a public employee who has a property interest in continued employment unless the employee is afforded an opportunity for a hearing regarding the sufficiency of the reasons for his termination"). Defendants challenge both prongs.

Florio alleges that he had a protected property interest in remaining Commissioner of MCDHH. Moreover, where his termination was calculated to damage his reputation and employability irreparably and permanently, Florio contends he has a protected liberty interest in his future employability that entitled him to due process in connection with his termination. Am. Compl. ¶ 119 [Doc. No. 4]. Defendants respond that the circumstances surrounding Florio's employment and termination did not give rise to a protected property or liberty interest that triggers his procedural due process rights.

        a.      <u>Protected Property Interest</u>

A property interest in employment exists where an employee has "a legally recognized expectation that he will retain his position." <u>Ortega-Rosario</u>, 917 F.2d at 73. State law determines whether an employee has a legally recognizable interest in their continued employment. <u>Id.</u>

"[O]rdinarily, one who can be removed only for 'cause' has a constitutionally protected 'property' interest, while one whose job is held 'at will' does not." Perkins v. Bd. of Dir. Of Sch. Admin. Dist. No. 13, 686 F.2d 49, 51 (1st Cir. 1982); see Bennet v. City of Bos., 869 F.2d 19, 21 (1st Cir. 1989) ("In the presence of a 'for cause' requirement, the employee typically has a legal basis for thinking he will, in all likelihood, be able to keep the job; in the absence of such a requirement, the state law typically does not provide him with good grounds for such an expectation").

Here, Florio failed to allege a constitutionally protected property interest in his employment. He provides no legal authority or factual basis for his conclusory statement that "as an executive level state employee, [he] had a protected property interest in employment," Am. Compl. ¶ 96 [Doc. No. 4], and "does not even allege the existence of any contractual provision or officially sanctioned rule of the workplace that would have entitled him to remain in his former position." Ortega-Rosario, 917 F.2d at 73. To the contrary, Massachusetts explicitly exempts the Commissioner from the general law that requires just cause to terminate tenured public employees. Mass. Gen. Laws ch. 6, § 193 ("The provisions of chapter thirty-one shall not apply to the office of commissioner" ); see Mass. Gen. Laws ch. 31, § 41 ("Except for just cause and except in accordance with the provisions of this paragraph, a tenured employee shall not be discharged, removed, suspended for a period of more than five days . . ."). Moreover, the statutory scheme grants state officials broad discretion to make dismissal decisions regarding the Commissioner position, allowing termination "whenever said administrator shall determine that the person appointed does not possess the approved qualifications for the position established." Mass. Gen. Laws ch. 30, § 45. Accordingly, based on the facts alleged and the statutory scheme

covering his former employment, Florio failed to assert a property interest in his employment as the MCDHH Commissioner that entitled him to procedural due process prior to his termination.

        b.     <u>Protected Liberty Interest</u>

Florio also contends the irreparable reputational and professional harm associated with his termination that rendered him unemployable in his profession entitled him to procedural due process protections before and after his termination. Individuals have a constitutionally protected liberty interest in having the ability "to engage in any of the common occupations in life." <u>Board of Regents v. Roth</u>, 408 U.S. 564, 572, (1972). The government infringes on this interest if its discharge of an at will employee "damage[s] the employee's reputation to such an extent that his 'liberty' to seek another job is significantly impaired." <u>Ortega-Rosario</u>, 917 F.2d at 74. But "neither the termination of employment nor statements that might be characterized as defamatory are, by themselves, sufficient to implicate the liberty interest," <u>id.</u>; the plaintiff must demonstrate that the defendant "create[d] and disseminate[d]" the false and defamatory impression about the plaintiff and that it was done "in connection with [his] discharge," <u>Burton v. Littleton</u>, 426 F.3d 9, 15 (1st Cir. 2005). Therefore, where an employee lacks a property interest in his employment as the case is here, "the due process requirement that he be afforded a hearing at which he may seek to clear his name is triggered only if the dismissal is based upon false and defamatory charges that are disseminated by the employer and stigmatize the employee so that the employee's freedom to obtain alternative employment is significantly impaired." <u>Id.</u> (citing <u>Codd v. Velger</u>, 429 U.S. 624, 628 (1997)).

Here, Florio fails to allege facts that demonstrate any one of the individual defendants intentionally disseminated false and defamatory information about him in connection with his termination. <u>See generally</u> <u>Lane v. Celucci</u>, 804 F. Supp. 400, 403 (D. Mass 1992) ("Where

17

individual government officials are being sued in their individual capacity, "[t]he complaint must allege specific facts against [each defendant]"). He contends that "[a]t the time of his termination, and after, the defendants released public statements which implied that the plaintiff had committed racist, anti-Semitic and/or discriminatory acts while employed by the defendants." Am. Compl. at ¶ 100 [Doc. No. 4]. But this statement alone is insufficient to allege defamation. And when pressed at oral argument, Florio, through his attorney, relied on his own statements as the source of the false and misleading information that he now asserts gave rise to his right to procedural due process. He contends that these statements apologizing for his affiliation with Kappa Gamma and disassociating from the organization "intimated and inferred that because of his (white) 'privilege' [he] was a racist and anti-Semitic[.]" Opp'n 11 [Doc. No. 23]. Florio argues that these sentiments should be attributed to Defendants because they drafted the statements and then "coerced and pressured" him into delivering them to MCDHH employees and stakeholders. Am. Compl. at ¶¶ 56–58 [Doc. No. 4]. But even if the court could somehow impute Florio's statements to Defendants, conceding a position of privilege is not defamatory and no reasonable inference of racism and antisemitism follows from such a concession. In any event, these statements were made in June 2020, and therefore could not be statements by the Defendants made in connection with Florio's termination in October.

The court is cognizant that the events as alleged here have placed Florio in a difficult position. Defendants announced an investigation into whether Florio was associated with alleged racism and antisemitism. Following that investigation, Defendants terminated Florio without clearing his name. The explanation Florio was given for his termination—which was unrelated to that investigation and which Florio contends was pretextual and false—effectively precludes him from debunking any misconceptions about his termination. Nonetheless, as set forth above,

Florio has failed to allege facts sufficient to support a procedural due process claim against the Defendants under Section 1983 and his claim must therefore be dismissed under Rule 12(b)(6).

**IV.    Conclusion**

For the foregoing reasons, Defendants' <u>Motion to Dismiss</u> [Doc. No. 12] is GRANTED with prejudice as to Counts V and VI against all remaining defendants.

IT IS SO ORDERED.

March 7, 2022

<u>/s/ Indira Talwani</u>
United States District Judge

19